**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 15-252 (PKC) |
| Plaintiff, | |
| v. | |
| HERNAN LOPEZ, and CARLOS MARTINEZ, | |
| Defendants. | |

**REPLY IN SUPPORT OF MOTION FOR SEVERANCE OF DEFENDANTS**

**SPERTUS, LANDES & UMHOFER, LLP**
Matthew Donald Umhofer
James W. Spertus
Samuel A. Josephs

*Attorneys for Hernan Lopez*

**MCCOOL LAW PLLC**
Steven J. McCool
Julia M. Coleman

Michael T. Cornacchia

Ramon A. Abadin

*Attorneys for Carlos Martinez*

In opposing severance of defendants Hernan Lopez and Carlos Martinez, the government repeatedly invokes this Court's order denying the severance motions of five other defendants before the 2017 trial.  (Dkt. 1429, at 14, 20.)  In doing so, however, the government ignores what the Court identified as the "determinative issue" in those motions: all of the defendants were charged in the RICO conspiracy.  (Dkt. 587, at 5.)  That determinative issue is absent here.

The government concedes it lacks the evidence to charge Mr. Lopez and Mr. Martinez with RICO conspiracy and eleven of the twelve other schemes charged in the Third Superseding Indictment ("TSI").  Yet, by opposing Mr. Lopez and Mr. Martinez's severance motion, the government insists on holding a trial in which the jury will be forced to consider, but asked to disregard, the enormous amount of evidence required to prove the RICO conspiracy, which, as this Court described it, is "unprecedented in its scope and breadth" (Dkt. 593, at 14).

The problem with that kind of a trial is obvious.  Joining defendants whose charges and evidence have so little in common results in unfair and unwieldy trials, even more so when the evidence of offenses charged against one is so vastly disproportionate to the evidence of limited charges against another.  In this case, evidence of the RICO conspiracy and the three other schemes with which Full Play Group, S.A., is charged will deluge jurors considering the single, narrow scheme charged against Mr. Lopez and Mr. Martinez, and will result in an unfair trial.

This is precisely what Rule 8(b) and Rule 14 are designed to prevent, which is why, in similar multi-conspiracy cases in this Circuit, courts have affirmed severance under Rule 8(b) or Rule 14.  Largely ignoring those cases, the government instead cites other cases whose facts, by comparison, actually illustrate the TSI's failure under Rule 8(b) and Rule 14; and asks the Court to deny the motion based on information that cannot be considered—facts not contained in the TSI and a superseding indictment that the government claims is forthcoming.

Instead, the Court should hew to the disciplined analysis required under Rule 8(b) and Rule 14, grant the motion for severance, and hold a focused trial that is limited to the actual allegations against Mr. Lopez and Mr. Martinez.

**A.    Rule 8(b) Requires Severance of Mr. Lopez and Mr. Martinez**

**1.    Potential Evidence and Allegations in Unfiled Superseding Indictments Are Irrelevant**

The government's first response to the motion for severance under Rule 8(b) is to reassure the Court that the evidence at trial will show that Mr. Lopez and Mr. Martinez were properly joined with Full Play and the other named defendants.  (*E.g.*, Dkt. 1429, at 6, 14.)

However, this argument should be rejected because, "[u]nder the plain language of Rule 8(b), the decision to join parties turns on what is 'alleged' in the 'indictment,'" *United States v. Rittweger*, 524 F.3d 171, 178 (2d Cir. 2008), "not on evidence later adduced" at trial.  *United States v. Bonventre*, 646 F. App'x 73, 80 (2d Cir. 2016).  It has been specifically "caution[ed]" that the plain language of Rule 8(b) does not appear to allow for consideration of pre-trial representations not contained in the indictment, just as the language of the Rule does not allow for consideration of evidence at trial."  *Rittweger*, 524 F.3d at 178 n.3; *see also United States v. Rajaratnam*, 753 F. Supp. 2d 299, 307 (S.D.N.Y. 2010) ("The Indictment must be measured under Rule 8(b) not by what the government could have alleged or what it hopes to prove but by the language the government has actually used in charging the defendants with their alleged crimes.").[1]  In evaluating whether joinder of Mr. Lopez and Mr. Martinez was proper under Rule

---

[1] In addition to ignoring the standard for evaluating severance motions under Rule 8(b), the government for unknown reasons states the standard of review for ruling on such motions *on appeal*, even suggesting in a parenthetical that a denial would be "'virtually unreviewable.'" (*See* Dkt. 1429, at 10 (quoting *United States v. Stirling*, 571 F.2d 708, 733 (2d Cir. 1978)).  This is both wrong on the law—review is de novo, *Rittweger*, 524 F.3d at 177—and belied by the numerous cases granting and affirming severance discussed in the motion and this reply.

8(b), then, this Court may not consider or rely on any of the government's representations about the evidence introduced during the 2017 trial (*e.g.*, Dkt. 1429, at 7, 15, 17), or the evidence it plans to introduce at trial in this case. This includes "the tracking of bribe payments in a ledger maintained by a Full Play executive" and "bank accounts maintained by Full Play in the United States and elsewhere" (Dkt. 1429, at 13), neither of which is mentioned in the TSI.

For the same reasons, the Court should reject the government's representations about its plans to seek yet another superseding indictment and, at trial, offer evidence "of only the trial defendants' guilt, tailoring its racketeering evidence to those aspects of the conspiracy most relevant to the defendants before the Court." (Dkt. 1429, at 14.) A Rule 8 analysis does not allow for consideration of the government's proposal for remediation through yet another superseding indictment or promises to limit its presentation of evidence.

### 2. The Only Relevant Information—the TSI's Actual Language—Compels Severance

Focusing on what is "*described in the language on the face of*" the TSI, *Rajaratnam*, 753 F. Supp. 2d at 307, severance should be granted. An indictment may name multiple defendants only if it alleges that the defendants participated in "the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). This means that the charges must "arise out of a common plan or scheme" or be "unified by some substantial identity of facts or participants." *Rittweger*, 524 F.3d at 177.

Circuit law is clear that joinder is improper unless a multi-scheme indictment alleges "that [each] defendant knew of or participated in the schemes other than the one with which he was charged." *United States v. Kouzmine*, 921 F. Supp. 1131, 1133 (S.D.N.Y. 1996).[2] Circuit

---

[2] *See also United States v. Ohle*, 678 F. Supp. 2d 215, 225 (S.D.N.Y. 2010) (knowledge is an "indicator of whether or not there is a common scheme or purpose"); *United States v.*

law is also clear that where "[c]ommission of one of the offenses neither depended upon nor necessarily led to the commission of the other," the offenses are not sufficiently unified for Rule 8(b). *United States v. Halper*, 590 F.2d 422, 429 (2d Cir. 1978). The TSI joins charges based on twelve separate schemes, implicates Mr. Lopez and Mr. Martinez in only one, and does not allege that they knew about or participated in any of the other schemes or the loosely-knit RICO conspiracy, which this Court has already recognized is "unprecedented in its scope and breadth." (Dkt. 593, at 14). The TSI, which does not allege that Copa Libertadores Scheme #2 depended on, evolved from, or led to the commission of any of the other charged schemes, in no way suggests that proof of Copa Libertadores Scheme #2 will constitute proof of any other scheme. Thus, joinder is improper under clear Circuit precedent.

Ignoring *Rajaratnam*, *Valdes*, *Greenfield*, *Ohle*, *Kouzmine*, *Lech*, *Menashe*, *Gentile*, *Giraldo*, and *Halper*—all cases approving severance in circumstances like those faced by Mr. Lopez and Mr. Martinez—the government claims joinder is justified because some of the charged schemes "share common defendants." (Dkt. 1429, at 12.) But it is "'well settled that two separate transactions do not constitute a series within the meaning of Rule 8(b) merely

---

*Valdes*, No. 05-CR-156 (KMK), 2006 WL 738403, at *11 (S.D.N.Y. Mar. 21, 2006) (for a joint trial of separate conspiracies to be proper, "there must be at least some allegation or offer of proof that all defendants share a common goal or purpose, or at least be aware of the other schemes."); *United States v. Greenfield*, No. 01 CR 401(AGS), 2001 WL 1230538, at *4 (S.D.N.Y. Oct. 16, 2001) ("Even if there are some common participants, generally similar objectives, and common confidential informants, multiple conspiracies must have a common goal or purpose to be joined under Rule 8(b)."); *United States v. Lech*, 161 F.R.D. 255, 257 (S.D.N.Y.1995) (granting severance because "Lech had very little, if any, knowledge of the other schemes, and did not participate in them"); *United States v. Menashe*, 741 F. Supp. 1135, 1138 (S.D.N.Y. 1990) ("Because there is no allegation in the indictment . . . that St. Francis or Ben Menashe were aware of or joined in O'Toole's plan, joinder of count two [charging O'Toole only] in the indictment is improper.").

because they are of a similar character or involve one or more common participants.'" *Ohle*, 678 F. Supp. 2d at 226 (quoting *Lech*, 161 F.R.D. at 256).

*Rajaratnam* illustrates this well.  Although the moving defendant, Chiesi, was charged in one insider trading scheme with Rajaratnam, and Rajaratnam was charged in another insider trading scheme, the district court, "considering the Indictment from Chiesi's perspective," ruled that severance of the two schemes was warranted because:  the other scheme "does not even mention Chiesi"; "on the face of the Indictment, Chiesi had no involvement in the other scheme[] charged"; "nothing else in the Indictment alleges that Chiesi even knew anything about" the other scheme; and "at most, [s]he had cursory knowledge of the other criminal activities." *Rajaratnam*, 753 F. Supp. 2d at 309 (citation omitted).  Mr. Lopez and Mr. Martinez, who are not charged and did not participate in or have knowledge of any other scheme alleged in the TSI, are in the same position with respect to Full Play as Chiesi was to Rajaratnam.  The Copa Libertadores Scheme #2 shares little in common with the other schemes and the RICO conspiracy charged against Full Play except that Full Play was involved.

Rather than grappling with *Rajaratnam* and other similar cases, the government relies on *United States v. Weisman*, 624 F.2d 1118 (2d Cir. 1980), *abrogated by Ianniello v. United States*, 10 F.3d 59 (2d Cir. 1993), and *United States v. Garcia*, 848 F.2d 1324 (2d Cir. 1988), *vacated*, 490 U.S. 858 (1989), to argue that the TSI satisfies Rule 8(b) simply because the RICO conspiracy charged in Count 1 is predicated in part on Cope Libertadores Scheme #2.  (Dkt. 1429, at 11.)  These cases do not stand for such a broad proposition.[3]

---

[3] Nor would applying the cases in this way be consistent with the analysis required under Rule 8.  "Whether joinder is proper in a particular matter is a question of law to be determined on a case-by-case review of the allegations of the indictment."  *United States v. Moran*, No. 11-CR-6083 (CJS), 2013 WL 6408124, at *2 (W.D.N.Y. Nov. 26, 2013).

*Weisman* is not on point.  All the charges there stemmed from the business affairs of a single entity—a theater—and the myriad alleged illegal activities centering on its operation and demise, from the fraudulent public offering of stock at its inception, to the secret skimming of profits that drove the theater into financial ruin, to the bankruptcy fraud that thwarted the theater's creditors.  *Weisman*, 624 F.2d at 1120-21.  The indictment charged all defendants with either securities fraud or bankruptcy fraud, and three defendants in a RICO count that identified as predicate acts the alleged securities fraud and bankruptcy fraud.  *Id.* at 1121.  Defendant Cannatella—who, like his codefendants, "assumed a management role in the Theatre" and participated in the secret skimming of profits—was charged in bankruptcy fraud counts but not in the RICO or securities fraud counts.  *Id.* at 1120-21, 1129.  He moved to sever, arguing the bankruptcy fraud charges were improperly joined with the securities fraud charges.  *Id.* at 1129.  While the Second Circuit upheld the denial of that motion, it did not hold that, as a matter of law, joinder is always proper under Rule 8(b) if defendants not charged in a RICO count are charged in a standalone count that is alleged as a predicate act in a RICO count.[4]  In ruling on a related issue raised by Weisman, the court held that there were "numerous similarities between the[se] predicate acts of racketeering," including the following:

> Weisman was a perpetrator of all of the acts of fraud and all were undertaken during the conduct of the Theatre's affairs.  Furthermore, the acts of stock fraud harmed legitimate investors in the Theatre and many of these same investors were again harmed when the later acts of bankruptcy fraud prevented the Theatre's financial rehabilitation.  The acts of fraud were also all directed toward the same goal of enriching Weisman and his confederates at the expense of the Theatre and through the device of the Theatre.  Finally, the methods of committing the acts of securities fraud were similar, as were the methods used in the acts of bankruptcy fraud.

---

[4] Had *Weisman* so held, that holding would undermined by *United States v. Indelicato*, 865 F.2d 1370, 1381 (2d Cir. 1989) (holding that "proof of two acts of racketeering activity without more does not suffice to establish a RICO pattern").

*Id.* at 1123 n.4.  Based on this significant overlap in the charges, the Second Circuit concluded

that Cannatella's bankruptcy fraud offenses were part of the same series of transactions as the

securities fraud offenses charged against Weisman and other theater managers, and thus joinder

was proper under Rule 8(b).  *Id.* at 1129.  This case does not involve the same degree of overlap

and interrelatedness of counts that was present in *Weisman*.  No single figure participated in all

the charged crimes, and there is no unifying business operation like the theater.  To the contrary,

the TSI alleges multiple, separate schemes in different countries involving different tournaments,

different companies, and different officials at different constituent organizations within FIFA.

Unlike Cannatella, who managed and skimmed profits from the theater with his codefendants,

Mr. Lopez and Mr. Martinez are not alleged to have participated in any of the TSI's other

schemes.  Indeed, the single scheme in which Mr. Lopez and Mr. Martinez have been charged, as

even the government concedes (Dkt. 1429, at 15), is factually unrelated to schemes charged

against overseas defendants and can easily be hived off for a separate trial.

   *Garcia* is also not on point.  As in *Weisman*, the charges in *Garcia* also arose from a

narrowly focused set of facts:  four drug buys in three months from a major cocaine distribution

network by one undercover agent.  *Garcia*, 848 F.2d at 1326-27.  The network's leaders were

charged together with conducting a narcotics racketeering enterprise, and with other defendants

in four conspiracy to distribute counts.  *Id.* at 1327.  Noting that "all of the counts in the

indictment concerning the non-RICO appellants were charged also in the RICO count as

predicate racketeering acts against" the network's leaders, the court affirmed denial of a

severance motion by the non-RICO defendants.  *Id.* at 1333.  But *Garcia* does not hold that

merely alleging other charged crimes as RICO predicates satisfies Rule 8(b).[5]  Like *Weisman*, *Garcia* involved a tightly circumscribed RICO charge whose predicate offenses were based on a series of drug sales orchestrated by the drug trafficking organization's leaders charged with racketeering.  Here, by contrast, the schemes on which the RICO conspiracy is predicated are far more factually and temporally distinct—so much so that neither Mr. Lopez nor Mr. Martinez is alleged to have known about any of the other schemes.  Rather than support joinder, *Garcia* illustrates how far short of satisfying Rule 8(b) the TSI falls.[6]

The TSI—which sweeps together charges based on twelve different schemes involving officials of at least ten different national and international soccer organizations in four global regions on two continents over the course of nearly twenty years—is a sprawling, tangled mess. No meaningful common thread connects Mr. Lopez and Mr. Martinez's alleged efforts to secure broadcasting rights to a tournament for private clubs in South America with, for instance, the bribes allegedly paid by an Asian Football Confederation official in Malaysia for votes in his bid to become FIFA president (TSI ¶¶ 96-99) or the bribes paid to a Trinidadian official to secure his vote for Russia as host of the 2018 World Cup (TSI ¶¶ 90-95).

––––––––––––––––––––––

[5] In fact, in *Garcia*, "[s]ix of the defendants were charged for alleged narcotics activities involving Garcia.  These defendants never went to trial, some pled guilty, or *were severed*, or (in one case) fled."  *Id.* at 1327 (emphasis added).

[6] Indeed, in *Garcia*, the Second Circuit recalled that it had "previously admonished the government that it must 'cease combining in an alleged single conspiracy, criminal acts loosely, if at all, connected,'" and cautioned that, despite its affirmance, "this does not mean, of course, that the government may arbitrarily jointly try defendants alleged to have engaged in unrelated conspiracies, for the rules governing joinder and severance still apply."  *Garcia*, 848 F.2d at 1333.  Here, the government's attempt to join Mr. Lopez and Mr. Martinez in a trial involving a RICO count—one that this Court recognizes is unprecedented in scope—simply because each is charged with participating in a limited way in one of the twelve schemes on which the RICO conspiracy is predicated completely disregards the Second Circuit's admonition.

Even focusing on just the schemes alleged against Full Play, no "reasonable person would easily recognize the common factual elements that permit joinder" of Mr. Lopez and Mr. Martinez, except in the Copa Libertadores Scheme #2 counts.  *United States v. Turoff*, 853 F.2d 1037, 1044 (2d Cir. 1988).  In the CONCACAF Scheme, Full Play's owners in 2011 allegedly paid bribes through Miguel Trujillo to CONCACAF officials Ariel Alvarado, Alfredo Hawit, and Rafael Salguedo to sell Full Play the media and marketing rights to CONCACAF tournaments.  (TSI ¶¶ 100-103.)  In the CONMEBOL World Cup Qualifiers Scheme, Full Play's owners allegedly bribed CONMEBOL officials to secure Full Play's rights to broadcast certain World Cup qualifying matches and international friendlies.  (TSI ¶¶ 79, 146-49.)   In the Copa America Scheme, Full Play, through José Hawilla and Alejandro Burzaco, allegedly bribed CONMEBOL officials and Jeff Webb, President of CONCACAF, to sell to Datisa S.A.—a joint venture between Full Play, Hawilla, and Burzaco—the Copa América tournament's media and marketing rights.  (TSI ¶¶ 80-85.)  These other schemes—which involve different tournaments (Copa América, the World Cup), different go-betweens (Trujillo, Hawilla), different companies (Datisa S.A.), and different officials of different entities (Webb, CONCACAF)—plainly do not arise from the same set of acts or transactions as those comprising Copa Libertadores Scheme #2.

The government dismisses these obvious differences (*see* Dkt. 1429, at 16 ("Differences of this sort exist between most, if not all, distinct offenses")) while incongruously insisting that there is a "substantial overlap" in the facts underlying Copa Libertadores Scheme #2 and the other Full Play schemes.  (*See* Dkt. 1429, at 12, 17.)  But the government's examples of that supposed overlap—that in the other schemes Full Play also paid bribes to officials who owed fiduciary duties to FIFA or one of its constituent organizations (*see* Dkt. 1429, at 13)—are really

conceptual, not factual.[7]  And Rule 8(b) "does not permit joinder of defendants solely on the ground that the offenses charged are of the same or similar character."  *Turoff*, 853 F.2d at 1042 (quotation marks omitted).  Nor will "the mere existence of similarities between some of the actors or some of the crimes committed . . . suffice."  *United States v. Carrozza*, 728 F. Supp. 266, 270 (S.D.N.Y. 1990).  Rule 8 requires a unity of facts so substantial that severance would result in an essentially duplicate presentation of the evidence at two trials.  *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003).  Given the TSI's failure to allege that Mr. Lopez or Mr. Martinez participated in or knew about any of the other schemes in which Full Play is implicated, a substantial factual unity to support joinder with Full Play does not exist.

### B.      Rule 14 Requires Severance To Avoid Undue Prejudice And To Promote Judicial Economy

Even if joinder is found to be proper under Rule 8(b), this Court should exercise its discretion and, under Rule 14, order a separate trial for Mr. Lopez and Mr. Martinez.  This is necessary to avoid substantial prejudicial spillover from the extensive evidence that will be required to prove the other schemes and RICO conspiracy charged against Full Play but not against either Mr. Lopez or Mr. Martinez.  *See United States v. Burke*, 789 F. Supp. 2d 395, 399 (E.D.N.Y. 2011) (finding the risk of prejudicial spillover significant, and granting severance, where non-RICO defendant was charged with RICO defendants in complex indictment spanning three decades).

---

[7]  The government also points to "the tracking of bribe payments in a ledger maintained by a Full Play executive" and "bank accounts maintained by Full Play in the United States and elsewhere."  (Dkt. 1429, at 13.)  But since these facts are not alleged in the TSI, the Court should not consider them in its Rule 8 analysis.  *E.g.*, *Rittweger*, 524 F.3d at 178; *Rajaratnam*, 753 F. Supp. 2d at 307.

Severance is also warranted for reasons of judicial economy.  A trial involving the *much more severe* RICO conspiracy charged in Count 1 would involve a protracted presentation of substantial evidence admitted solely against Full Play and would necessitate near constant requests for limiting instructions to the jury.  *See United States v. Bellomo*, 954 F. Supp. 630, 650 (S.D.N.Y. 1997) (severing non-RICO defendants who "would face a lengthy trial that would include evidence of a RICO enterprise in which none of them is charged with participating").

The government contends that the likelihood of prejudice is minimal because Mr. Lopez and Mr. Martinez's "role was important to the scheme and they were among the primary beneficiaries of the scheme."  (Dkt. 1429, at 20.)  But these claims are belied by the sparse, opaque allegations in the TSI.  (*See* TSI ¶¶ 73-74.)

The government also argues that prejudice is unlikely because this is "not a case where the jury will hear evidence of violence as to one defendant that might arguably spill over to taint their view of a co-defendant not charged with such a crime."  (Dkt. 1429, at 21.)  This is also an issue raised by the Court in prior severance motions.  (*E.g.*, Dkt. 593, at 38 (COURT:  "But I am just trying to get to the point that most of the cases that have been cited to me have to do with the prejudice that emanates from the differences in severity of the crime itself, as opposed to the volume of the crime or the separateness of the activity . . . Volume of evidence.  Not volume of crime.")  But evidence of violence is not the only type of evidence capable of causing prejudice. A RICO charge inevitably raises the specter of organized crime.  *See United States v. Turkette*, 452 U.S. 576, 589 (1981) (finding that the "declared purpose of Congress" in creating the RICO statute was "to seek the eradication of organized crime in the United States" (quotation marks omitted)).  Being joined with Full Play for the trial of a RICO charge in which Mr. Lopez and Mr. Martinez are not named will just as inevitably cause the jury to speculate, improperly, about

whether Mr. Lopez and Mr. Martinez are connected with organized crime.  As already noted, undue prejudice will also result from evidence of the depth of FIFA's corruption, from which jurors will improperly conclude that anyone doing business with FIFA must "pay to play."  *See United States v. Locascio*, 357 F. Supp. 2d 536, 544 (E.D.N.Y. 2004) (granting severance to non-RICO defendants "even if the government does not present evidence of murder or other violent activities" because "the mere association with a Mafia family [*i.e.*, a highly corrupt organization] is, in itself, highly prejudicial").

There is little that reassures in the government's promise to obtain another superseding indictment and present evidence "only of the trial defendants' guilt, tailoring its racketeering evidence to those aspects of the conspiracy most relevant to the defendants before the Court." (Dkt. 1429, at 15.)  Assuming a grand jury can be properly used in this manner, Full Play is charged in the RICO conspiracy and with three other unrelated schemes, and the government's case promises to include a substantial amount of evidence unrelated to Mr. Lopez and Mr. Martinez—evidence that will substantially prejudice them by wrongly suggesting to the jury that they must have known about, condoned, and encouraged Full Play's willingness to exploit the widespread corruption within FIFA's ranks.

For example, as the government openly admits, it will call Santiago Peña to "explain the complete Full Play bribe ledger, *not just the line items related to the Copa Libertadores*, as the amounts owed and payed are interspersed and relate to the Copa América, qualifiers, and friendlies."  (*See* Dkt. 1429, at 17 (emphasis added).)  The referenced ledger—a spreadsheet that does not mention either Mr. Lopez or Mr. Martinez and contains only one reference to "Fox" in the entirety of its 23 pages which purportedly list hundreds of payments made between 2010 and 2015 (GX-601T)—graphically illustrates the discrepancy in the evidence that will be presented

at the trial contemplated by the government.  The government's claim that, because "the evidence of Full Play's crimes completes the story of the Copa Liberatores Scheme, such evidence is admissible *as to each of the three defendants*" (Dkt. 1429, at 17 (emphasis added)), foreshadows the type of prejudicial, guilt-by-association arguments that the government will advance, and therefore the numerous objections that Mr. Lopez and Mr. Martinez will be called upon to make, if they are tried jointly with Full Play.

The government's arguments about the "enormous" and "extraordinary" inefficiency occasioned by multiple trials (Dkt. 1429, at 3, 7, 25, 26) ring hollow since the government's decision to charge Mr. Lopez and Mr. Martinez after the 2017 trial made multiple trials in this case unavoidable.  Furthermore, there is every reason to believe that use of two different juries will increase efficiencies while aiding the jurors' ability to reach a fair result.  *See, e.g.*, *United States v. Vastola*, 670 F. Supp. 1244, 1262 (D.N.J. 1987) (severing RICO defendants from non-RICO defendants "for case management reasons.").  A focused trial of the limited facts alleged against Mr. Lopez and Mr. Martinez would last only several days, at most, thereby avoiding many of the challenges (and appellate issues) that a lengthier, substantially more complex trial with Full Play would create, such as the inevitable delays caused by illness and scheduling problems of jurors, witnesses, and counsel.  Separate trials will also assist each of the juries in compartmentalizing the evidence put before them.  Compartmentalizing the evidence will be an especially difficult task for any jury at a joint trial in this case given that neither of Full Play's charged owners will appear at counsel table, leaving Mr. Lopez and Mr. Martinez as the only human defendants in the courtroom.

In a joint trial, the government will be able to present evidence of a host of significant crimes involving Full Play that have not been charged against Mr. Lopez and Mr. Martinez.

Even with cautionary instructions, human nature being what it is, jurors will naturally, though improperly, infer that the corruption within FIFA was so longstanding, multifaceted, and pervasive that the only way to obtain broadcasting rights to a soccer tournament is through bribes and that Mr. Lopez and Mr. Martinez "must have known" that this is how their employer obtained the broadcasting rights to the Copa Libertadores.  The jury could not draw such impermissible inferences in a narrow trial focused on the limited counts in which Mr. Lopez and Mr. Martinez are charged.  This is precisely why severance is not only appropriate but necessary.

For the foregoing reasons, Mr. Lopez and Mr. Martinez should be severed for trial.

Dated: August 26, 2020

Respectfully submitted,

SPERTUS, LANDES & UMHOFER, LLP

/s/ Matthew Donald Umhofer

Matthew Donald Umhofer
James W. Spertus
Samuel A. Josephs

*Attorneys for Hernan Lopez*

MCCOOL LAW PLLC

/s/ Steven J. McCool
Steven J. McCool
Julia M. Coleman

/s/ Michael T. Cornacchia
Michael T. Cornacchia

/s/ Ramon A. Abadin
Ramon A. Abadin

*Attorneys for Carlos Martinez*