SPN/PTH/KTF/VAZ
F. #2015R00747

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

      - against -                      Docket No. <u>15-CR-252 (S-3) (PKC)</u>

FULL PLAY GROUP S.A., <u>et</u> <u>al</u>.,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

### THE GOVERNMENT'S MEMORANDUM IN OPPOSITION TO THE DEFENDANTS' <u>MOTION TO COMPEL OR, IN THE ALTERNATIVE, FOR A RULE 17 SUBPOENA</u>

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Samuel P. Nitze
Patrick T. Hein
Kaitlin T. Farrell
Victor A. Zapana
Assistant U.S. Attorneys
    (Of Counsel)

1

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this brief in opposition to defendants Hernan

Lopez and Carlos Martinez's (the "Defendants") motion for an order compelling the government

under Rule 16 of the Federal Rules of Criminal Procedure to obtain from PricewaterhouseCoopers

("PwC") and produce to the Defendants the following materials belonging to Argentina-based

sports marketing and production company Torneos y Competencias S.A. ("Torneos"):

   (1) "backup tapes,"
   (2) "live server snapshot,"
   (3) "local PST or local mailbox files" of Torneos employees,
   (4) "chain of custody forms,"
   (5) notes from custodian interviews, and
   (6) notes that PwC's forensic practices leader (Dyan Decker) used to refresh her
       recollection at the 2017 trial

(the "Requested Materials"), or, in the alternative, for the issuance of Rule 17 pretrial subpoenas

to PwC for the Requested Materials.  <u>See</u> ECF Dkt. No. 1680 ("Mot.").  The motion is meritless

and should be denied.

As with the Defendants' previous application for a Rule 17 subpoena compelling

production of Alejandro Burzaco's personal email accounts, the instant motion falls well short of

satisfying the standard for compelling access to materials held by a third party.  Indeed, the motion

asks this Court to create an unprecedented and far-reaching modification of basic restrictions that

have long governed the issuance of orders to compel and Rule 17 subpoenas in analogous contexts.

At bottom, the Defendants seek to take possession of a company's entire server, including full

copies of certain employee email accounts, as well as privileged work product materials, all from

a non-party accounting firm that was retained by counsel to assist in conducting an internal

investigation.  The Defendants' motion makes no mention of this Court's order dated September

3, 2021 rejecting the Defendants' previous, more limited request for access to materials held by

Torneos; the Court's authorization, in the same letter, of a letter rogatory to Torneos seeking a

subset of the requested documents; the voluminous materials already obtained and produced by the government during the course of Torneos' cooperation; or the broader interests in protecting attorney-client and work-product privileges, trade secrets, foreign privacy laws, personal information of innocent third parties, and witness safety.

Unsurprisingly, given the extraordinary nature of their request, the Defendants do not cite a single rule, case, or other precedent that meaningfully supports their novel proposition, or any example, from their own or any other documented experience, in which relief of the sort they request has been granted. The Defendants also fail to provide factual support for their claim that the Requested Materials are within the government's control or would be material to the preparation of a defense, and their requested Rule 17 subpoenas run afoul of well-established legal principles, including Rule 17's basic requirements of relevancy, admissibility, and specificity.

In light of the foregoing, and for the reasons discussed further below, the motion should be denied in its entirety.

<u>BACKGROUND</u>

I.      <u>May 2015, the First FIFA Indictment, and the First FIFA Trial</u>

The first indictment in this case was unsealed on May 27, 2015, in connection with the arrests of several defendants in Zurich, Switzerland, where various soccer officials and sports marketing executives had gathered in advance of the 65th FIFA Congress. The indictment charged 14 defendants with racketeering conspiracy and wire fraud and money laundering offenses, among other crimes relating to the corruption of international soccer. <u>See generally</u> ECF Dkt. No. 1.[1]

---

[1] Subsequent, superseding indictments were returned on November 25, 2015 (S-1), November 6, 2017 (S-2), and March 18, 2020 (S-3).

Among those charged in the first indictment was Alejandro Burzaco, the CEO of Torneos. Upon the unsealing of the first indictment, Torneos and its board of directors immediately arranged for the retention of top-tier U.S. counsel to conduct an internal investigation. PwC was retained by counsel in connection with that investigation. Soon thereafter, Torneos began cooperating with the government. Torneos and its board undertook an internal investigation of their own accord, for reasons that, in the government's understanding, extended beyond the company's interest in cooperating with the government, to include the company's own interest in assessing and mitigating misconduct by its employees and related compliance failures. Soon after the unsealing of the government's charges, U.S. counsel, with the assistance of PwC, took substantial steps to secure documents and data and to assess the scope of Torneos' involvement in the charged conduct.

On December 13, 2016, Torneos entered into a Deferred Prosecution Agreement ("DPA") with the government pursuant to which, among other things, Torneos accepted responsibility for its criminal conduct, paid financial penalties, continued its implementation of various compliance reforms, and committed to continued cooperation with the government. See United States v. Torneos, 16-CR-634 (PKC) (E.D.N.Y.), ECF Dkt. No, 4-2. During the course of its investigation, Torneos produced to the government – and the government, in turn, produced to the Defendants – hundreds of thousands of pages of documents, including emails, calendar entries, contracts, financial records, and letters, many of which are relevant to the charges pending against the Defendants. The government understands that Torneos provided it with all non-privileged documents relevant to the charges against the Defendants and their co-conspirators. The four-year term of the DPA expired on December 13, 2020, and, the following day, on motion of the government, the Court dismissed the pending wire fraud conspiracy charge against Torneos. See

Torneos, ECF Dkt. No. 20 at 1.  In so doing, the Court recognized Torneos and its new leadership

for, among other things, "what appears to be a breathtaking effort over the past four years to really

reform the company to set an example hopefully to the rest of the professional sports marketing

world."  Torneos, Dec. 14, 2020 Tr. 8:11-15 (ECF Dkt. No. 21).

        Trial on the second superseding indictment began on November 6, 2017.  Dyan

Decker, a partner at PwC who leads the firm's forensic services practice, testified briefly during

the government's case-in-chief for the purpose of authenticating 18 exhibits that were admitted

into evidence at trial.  See Trial Transcript ("Tr.") at 1943:18-1944:15 (describing tracing of

exhibit documents back to "original source" at Torneos); Tr. 1958:16-19 (testifying that in

preparation for her testimony, Ms. Decker "determine[d] where each of the documents on this disk

came from at Torneos and how they were preserved").  Decker testified that, following the

unsealing of the indictment of Burzaco and certain of his co-conspirators, she was "hired to collect

and preserve and analyze documents and digital information" at Torneos using "industry standard

practice of preserving and collecting the evidence that was deemed to be appropriate to be part of

the investigation."  Tr. 1942:9-18.  Decker explained that to collect documents as part of the

internal investigation, her team searched "backup tapes," which, she explained, "is a snapshot at a

point in time of a server – in this particular case of an e-mail server of Torneos."  Tr. 1959:7-9.

She further explained that PwC collected backup tapes at six-month intervals,[2] and that they also

collected a "snapshot of the e-mail server at the time [of the internal investigation in June 2015]

---

[2] See Tr. 1960:1-11 ("If you think about a backup tape dated June 30, 2012 that will be a snapshot in time of all of the e-mails that are residing in the e-mail boxes and so that server e-mail boxes and so – and providing whatever is available at that time stretches back prior to June 30, 2012.  And so then when you take the December, the end of December 2012 backup tape, it might have a lot of duplication with the backup tape from June 30th but then it contains incrementally new e-mail messages, calendar entries and things of that time from the time of the first backup tape to the time of the second backup tape.").

and that's what we typically called a live – quote unquote live server," Tr. 1962:15-17, in addition to hard-copy documents from the offices of Torneos employees, see Tr. 1962:24-1963:1. During her testimony, Ms. Decker referred to notes to refresh her recollection about the origin of the 18 exhibits she authenticated, which notes were turned over prior to trial pursuant to 18 U.S.C. § 3500.

II.     The Third Superseding Indictment

As alleged in the Third Superseding Indictment ("TSI"), the Defendants participated in various bribery and kickback schemes in connection with their efforts to secure the lucrative sports media and marketing rights to soccer tournaments and related events. The Defendants, who served as top executives at a subsidiary of Twenty-First Century Fox, Inc. ("Fox") and were responsible for, among other things, developing Fox's sports broadcasting businesses in Latin America, see id. ¶¶ 21-22, are each charged with wire fraud conspiracy, wire fraud, and money laundering conspiracy in connection with their participation in the Copa Libertadores Scheme #2, see id. ¶¶ 72-74, 129-35.

Trial on the TSI is scheduled to begin in approximately four months, on May 23, 2022.

III.    The Defendants' Previous Motions and Arguments Regarding Mr. Burzaco's Devices
        and Email Accounts

On August 17, 2021, Lopez and Martinez moved for issuance of a subpoena compelling production of the BlackBerry, iPhone, and related "chips" in the possession of Mr. Burzaco's counsel and a letter rogatory to Torneos requiring the production of "[a]ll information from or relating to" Mr. Burzaco's BlackBerry device. See ECF Dkt. No. 1599-4. On August 20, 2021, the Court initially granted the motion but later that day stayed its order at the government's request to give the government an opportunity to file a response. See Aug. 20, 2021, Minute Orders. On August 27, 2021, the government filed a motion to quash, arguing that the requested

5

process was improper under applicable law but offering to review the BlackBerry, iPhone, and chips for relevant materials.  See ECF Dkt. No. 1614.  On September 3, 2021, the Court issued an order granting in part and denying in part the government's motion to quash.  See ECF Dkt. No. 1621.  Specifically, the Court, among other things, directed the government to make good on its offer to obtain Burzaco's devices, denied the Defendants' request for all information "from or relating to" Mr. Burzaco's BlackBerry device, and authorized a letter rogatory to Torneos for email communications, text messages, calendar entries, and WhatsApp communications from Mr. Burzaco's BlackBerry that were stored or maintained on certain Torneos servers, to be provided to the government for review for discoverable materials.  Id. at 3.

Thereafter, the government arranged for delivery of the devices from Mr. Burzaco's counsel to forensic examiners, who prepared the data for review.  The government has since produced materials obtained from the iPhone, including communications, that were arguably discoverable under Federal Rule of Criminal Procedure 16; has produced files related to the examiners' review of the BlackBerry and chips; and has offered to run further tests, within reason, on the BlackBerry and chips should defense counsel so request.

On December 13, 2021, Lopez and Martinez sought subpoenas to email service providers Google and Yahoo for the entire contents, without date limitation, of four personal email accounts of Mr. Burzaco, asking that the Court make the subpoenas returnable to the government with the direction that the government review all the materials and thereafter promptly produce all materials discoverable pursuant to Rule 16, Brady and Giglio.  See ECF Dkt. No. 1663 at 4.  The government opposed the motion.  On January 17, 2022, the Court issued an order under seal denying the Defendants' motion, holding that they failed to demonstrate relevance or materiality.  Sealed Order at 3-4 (ECF Dkt. No. 1693).

On January 21, 2022, the Court separately denied a motion by Martinez's and Lopez's co-defendant Full Play Group for overbroad subpoenas and letters rogatory to Torneos and other entities.  See ECF Dkt. No. 1694.  There, the Court held that "the information Full Play request[ed was] immaterial, irrelevant, and violates the fundamental principle that Rule 17 is not a tool to engage in a general fishing expedition."  Id. at 2.

ARGUMENT

I.    Lopez and Martinez's Motion to Compel Should Be Denied

The Court should deny the defendants' motion to compel production of the Requested Materials pursuant to Rule 16.  The Requested Materials fall essentially into two categories: (1) the entire contents of Torneos' servers at various points in time, and (2) work product created by PwC relating to the collection of these materials during an internal investigation conducted at the direction of counsel.  The government agrees that certain documents contained on Torneos' servers are discoverable and material to preparing a defense, but the government has already obtained from Torneos and produced to the Defendants the relevant, non-privileged materials that were housed on the company's "backup tapes," "live server snapshot," and "local PST or local mailbox files" of Torneos employees.[3]  The server, PwC work product, and related Requested Materials, however, are not now and never have been in the government's possession, nor have the Defendants established their relevance, let alone materiality, to preparation of a defense.  Against this backdrop, the Defendants have provided no basis, legal or factual, for the Court to order the government to obtain or produce the Requested Materials.

---

[3]  Of course, it is possible additional relevant materials may exist – no review of large quantities of data is perfect – but there is no reason to think any documents that are material to the defense were missed, and the government will of necessity forego the opportunity to make use of materials helpful to its case that it has not obtained.

A.      Applicable Law

"Documents in the hands of cooperating third parties are not attributable to the [g]overnment."  United States v. Tomasetta, No. 10-CR-1205 (PAC), 2012 WL 896152, at *4 (S.D.N.Y. Mar. 16, 2012); see United States v. Weaver, 992 F. Supp. 2d 152, 157 (E.D.N.Y. 2014) (rejecting defense contention that documents in the possession, custody, or control of cooperating witnesses, including related companies, are within the control of the government); United States v. Josleyn, 206 F.3d 144, 154 (1st Cir. 2000) (rejecting that cooperating company was part of "prosecution team" and holding that government is not accountable for information known by cooperating private parties.  Nor is the government obligated to obtain any and all evidence from cooperating witnesses or entities.  See Weaver, 992 F. Supp. 2d at 157 ("To the extent that the cooperating witnesses withheld documents relevant to the investigation from the government in response to its request, the government is not required to produce such documents to defendants."); United States v. Buske, No. 09-CR-65 (LA), 2011 WL 2912707, at *7-8 (E.D. Wis. 2011) (rejecting argument that "[b]ecause of the coordinated effort between [the third-party company] and the government, . . . the government [must] be ordered to seek out certain discovery materials from [the company]."); see also United States v. Hutcher, 622 F.2d 1083, 1088 (2d Cir. 1980) ("We reject . . . a notion of 'possession' which is so elastic as to embrace materials that the prosecution never had in its files, never inspected, and never knew about."); United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998) ("the imposition of an unlimited duty on a prosecutor to inquire . . . would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis" (internal citations omitted)).

While at least one court has recognized that the government may have "control" over materials in the possession of a company that is subject to the terms of a DPA, even that court

8

acknowledged that such "control" is not unfettered.  See United States v. Stein, 488 F. Supp. 2d 350, 362 (S.D.N.Y. 2007) (holding that government controlled materials in possession of entity subject to DPA, but acknowledging such control would not extend to privileged materials).  But see United States v. Raheja, No. 19-CR-559 (SEL), 2020 WL 7769725, at *2-3 (N.D. Ohio Dec. 30, 2020) (government had no Rule 16 obligation to produce certain "documents, communications, and other evidence" in possession of "third party conspirator whose cooperation was secured through a contractual promise of leniency" through a deferred prosecution agreement); United States v. Norris, 753 F. Supp. 2d 492, 529-31 (E.D. Pa. 2010) (government had no Rule 16 obligation to produce materials from third-party corporations that entered into cooperation agreements).  Moreover, the government is not entitled to demand, or disseminate, privileged materials from an entity subject to a DPA.  See Stein, 488 F. Supp. 2d at 362 (analyzing whether cooperating company's materials were privileged and therefore could be withheld from the government and criminal defendants even under "control" theory); see also Justice Manual 9-28.710, Principles of Federal Prosecution of Business Organizations ("[W]hile a corporation remains free to convey non-factual or 'core' attorney-client communications or work product – if and only if the corporation voluntarily chooses to do so – prosecutors should not ask for such waivers and are directed not to do so."); United States v. HSBC Bank USA, N.A., No. 12-CR-763 (JG), 2013 WL 3306161, at *6 & n.10 (E.D.N.Y. July 1, 2013) (Gleeson, J.) (criticizing past instances in which companies were required to waive privilege as part of cooperation, describing the "enormous backlash" that ensued among the defense bar, and noting related change in Department of Justice policy regarding corporate cooperation credit).  Even assuming that the government is in "control" of certain materials in the possession of an entity subject to the terms of a DPA (which, as the authorities above demonstrate, is not settled law), such control is governed

9

by the operative terms of the DPA; it does not simply stem from a company's cooperative posture. Stein, 488 F. Supp. 2d at 362; see Tomasetta, 2012 WL 896152, at *5.[4]

    B.    <u>Argument</u>

        1.    <u>The Requested Materials Are Not in the Government's Possession, Custody, or Control</u>

The Defendants premise their motion to compel on the notion that the government has "possession, custody, or control" over the requested materials.  Mot. at 1.  The argument is meritless.

As the above-cited authorities make clear, an entity is not brought under government control or properly viewed as part of the prosecution team simply because it cooperates with a government investigation.  Tomasetta, 2012 WL 896152, at *4 ("[T]he fact that a third-party corporation is cooperating with the Government's investigation – as many do – does not turn it into an 'agent' of the Government."); Josleyn, 206 F.3d at 154 ("While prosecutors may be held accountable for information known to police investigators, we are loath to extend the analogy from police investigators to cooperating private parties who have their own set of interests. Those private interests, as in this case, are often far from identical to – or even congruent with – the government's interests."  (internal citations omitted)); Raheja, 2020 WL 7769725, at *3 ("In exchange for its cooperation and the payment of a hefty fine, [the cooperating company] avoided

---

[4] Moreover, as later recognized in <u>Meregildo</u>, <u>Stein</u>'s conclusion that the government was "in possession," for the purposes of Rule 16, of materials held by a company under a DPA is inapplicable in the <u>Brady</u> context.  <u>United States v. Meregildo</u>, 920 F. Supp. 434, 443 (S.D.N.Y. 2013) ("The [<u>Stein</u> court] found that Rule 16 encompassed far more than physical control or possession.  To reach this conclusion, the court imported civil discovery principles into a criminal case.  But the Federal Rules of Civil Procedure do not establish the boundaries of the Government's due process obligations under <u>Brady</u>.  And imposing their generous reach on the Government as a constitutional mandate is a bridge too far.  Because of this, <u>Stein</u> does not address the Government's <u>Brady</u> obligations." (citations omitted)), <u>aff'd sub nom.</u>, <u>United States v. Pierce</u>, 785 F.3d 832 (2d Cir. 2015).

more drastic sanctions, such as prosecution. That it must respond to the government's inquiries and requests for information does not transform it into an agent of the government, acting on the government's behalf and with the government's interests in mind.").

Thus, the fact that Torneos remains in a generally cooperative posture with respect to the government's ongoing investigation and prosecution does not put its servers under government control. This would be true even if Torneos were still under a DPA with the government, see Raheja, 2020 WL 7769725, at *2-3; Norris, 753 F. Supp. 2d at 529-31, but, as the Court and parties know, the DPA expired on December 13, 2020. During its cooperation under the DPA, Torneos was required to, and did, produce non-privileged documents relevant to the government's investigation. See Ex. A, Jan. 27. 2022 Ltr. from Torneos to Gov't at 1.[5] It was not required to produce, and it would have been improper for the government to ask for, privileged or irrelevant materials. Similarly, the company was not required to turn over the entirety of its server, nor would the government have wanted it to, as the server surely contains privileged communications, trade secrets, personal information, and other sensitive materials that either the government is not entitled to see or are wholly irrelevant to the government's investigation. In any event, Torneos is no longer subject to the terms of the DPA, and the company thus is under no obligation to produce documents, much less its servers, to the government. See Stein, 488 F. Supp. 2d at 362 (government's control of company's materials dictated by terms of DPA).

The cases cited by the defendants are not to the contrary:

- In United States v. Kilroy, 523 F. Supp. 206, 215 (E.D. Wis. 1981), the court acknowledged that a cooperating company had "no obligation to turn over any of its records to the defendant or to the [g]overnment except at trial pursuant to a valid subpoena" but concluded that it was "not unreasonable" to order the government to obtain them for the purposes of trial efficiency. Id. The records at issue were documents from the defendant's

---

[5] Torneos provided the attached letter to the government outlining its concerns with the Defendants' motion for the Requested Materials, which we attach here as Exhibit A.

own office at the company. Here, in contrast, the government has already requested and received all relevant records and, further, there is no reason to think that the Requested Materials contain additional documents relevant to the defendants, in contrast to materials held in the Defendants' offices.

- In <u>United States v. Skeddle</u>, 176 F.R.D. 258, 262 (N.D. Ohio 1997), the requested materials had previously been in the government's possession but the government had returned them without producing them to the defendants. In this case, to the extent the government has ever possessed discoverable documents produced by Torneos, they have been produced to the defendants.

- In <u>Stein</u>, as discussed above, the court's holding that the government was in control of a cooperating company's materials was premised on the terms of an ongoing DPA. <u>See</u> 488 F. Supp. 2d at 362.

Because the government does not have possession, custody, or control of the requested materials, the Court should deny the Defendants request to compel their production.

2.    <u>The Defendants Already Have the Non-Privileged Rule 16 Documents Contained in the Requested Materials</u>

The Defendants' argument that the Requested Materials are material to their defense also fails, principally because the Defendants already have the relevant, non-privileged materials available from the identified sources. <u>See</u> Mot. at 6.

The government agrees, of course, that many documents held by Torneos are material to the preparation of a defense (and to the government's proof at trial). That is why, during the course of its cooperation, Torneos produced to the government – and the government, in turn, produced to the Defendants – hundreds of thousands of pages of documents, including communications, contracts, financial records, calendar entries, invoices and other materials, many of them relevant to the pending charges. Many of these materials came from the very "backup tapes," "live server snapshot," and "local PST or local mailbox files" of Torneos employees that the Defendants now seek to obtain through compulsory process. <u>See</u> Tr. 1944:18-1948:15,

12

1962:14-1973:16 (Decker).[6]

The Defendants state that it is "practically certain" that the backup tapes and live server snapshot of Torneos servers and related documents contain information material to the preparation of the defense, Mot. at 2, but they do not explain what those materials – beyond documents already obtained and produced by the government – are likely to be.[7]  They note that the government used materials obtained from the identified sources at trial, but this fact does nothing whatsoever to advance the argument that information material to their defense has yet to be provided to them.  The Defendants argue that the government should not be able to selectively use documents helpful to the government's case, but, again, Torneos produced to the government all relevant documents it obtained – and the government turned them over to the Defendants –

---

[6] Contrary to what the Defendants suggest, see Mot. at 7, Ms. Decker and Mr. Rodriguez do not provide conflicting testimony about data destruction at Torneos.  Ms. Decker testified that she and her team did not "find any evidence of destruction of [electronic] documents" during their trip to Buenos Aires, and that she was not "personally aware" of any "physical destruction" through the "shredding of paper documents" or "mutilat[ion]" of Torneos servers "[a]s it relates to the[] documents" she had authenticated at trial.  Tr. 1946:11-18, 1950:3-14, 1981:3-24.  Ms. Decker made no generalizations about data destruction; in fact, she explained that her team's role was not "to investigate destruction of documents," but rather "to collect and preserve documents that were available" during her team's trip to Buenos Aires.  Tr. 1986:7-14.  Meanwhile, Mr. Rodriguez testified that he directed the destruction of a server in Uruguay and that he saw other Torneos employees physically "[d]estroying information" with "shredders" shortly after the original indictment was announced on May 27, 2015 – that is, before Ms. Decker's trip.  Tr. 2207:10-16, 2209:10-18; see also Tr. 2276:24-2277:2, 2277:18-2278:14, 2384:22-25.  The witness' statements were limited to their own personal observations and are not inconsistent.

[7] The Defendants reference chain of custody forms, but these documents are irrelevant except in the service of authenticating documents, which the government has and may accomplish by other means.  Law firms that produce documents from cooperating entities, or financial institutions under subpoena, or individual witnesses often maintain forms documenting chains of custody of devices, servers, data, and physical files, but the government need not make use of such documents.  See United States v. Vayner, 769 F.3d 125, 130 (2d Cir. 2014) ("The simplest (and likely most common) form of authentication is through the testimony of a witness with knowledge that a matter is what it is claimed to be." (internal quotation marks omitted)).  The government is not in possession of these forms and, in any event, they are not Rule 16 material as there is no reason to believe they are material to the defense.

including documents that are unhelpful to the government's case and helpful to the Defendants.

Because the Defendants already have the materials they seek – that is, relevant, non-privileged documents held by Torneos – their request to inspect the company's servers should be rejected.  See United States v. Xiaoquing Zheng, No. 19-CR-156 (MAD), 2020 WL 6287481, at *5 (N.D.N.Y. Oct. 27, 2020) (quashing subpoena where there was overlap between materials government had already produced and requested materials); United States v. Bergstein, No. 16-CR-746 (PKC), 2017 WL 6887596, at *5 (S.D.N.Y. Dec. 28, 2017) (same).

### 3.    The Defendants' Request Is Unsupported by Law

The Defendants' request for an unprecedented order directing the government to obtain a third-party entity's entire server, complete employee email PSTs, and work product generated by an accounting firm retained during an internal investigation run by counsel, is unsupported by law.  Thus, even if, hypothetically, there were undisclosed documents material to the preparation of a defense held on the Torneos server (the government has no reason to think there are) and Torneos were still under a cooperation agreement with the government (it is not), the order should be denied.

The Defendants do not cite a single case, published or otherwise, in which the government has been compelled to obtain – much less turn over to a criminal defendant – a cooperating entity's entire server, and the government is aware of none.[8]  This may be because

---

[8] Notably, the firm representing Lopez – which touts its deep experience conducting internal investigations on behalf of corporations that ultimately enter into deferred prosecution agreements, see, e.g., Debevoise & Plimpton LLP, Internal Investigations, https://www.debevoise.com/capabilities/practice-areas/white-collar-regulatory-defense/internal-investigations – has not offered a single instance in which it, or an accounting firm it engaged to assist in conducting an internal investigation, has turned over a client company's entire server to a criminal defendant.  Apparently, it is the firm's position in this case that such materials are available to the government for the asking.

such a practice would do little to advance the truth-seeking function, fairness, or efficacy of the adversarial trial process but would grind government investigations to a halt while simultaneously risking needless, potentially lawless exposure of privileged, personal, commercially sensitive, or otherwise confidential information.  See Avellino, 136 F.3d 255 ("the imposition of an unlimited duty on a prosecutor to inquire . . . would condemn the prosecution of criminal cases to a state of paralysis" (internal citations omitted)); Ex. A at 2 (describing unknown volume of documents in Torneos server "protected from disclosure by, among other things, legal privilege, data privacy law, trade secrets law, or confidentiality obligations that Torneos has undertaken"); cf. United States v. Avenatti, – F. Supp. 3d –, No. 19-CR-374 (JMF), 2021 WL 4120539, at *3 (S.D.N.Y. Sept. 9, 2021) (noting that subjecting a victim witness to an electronic forensic search of her cellphone as part of Rule 16 discovery "would undoubtedly discourage victims and witnesses alike from coming forward and cooperating with law enforcement investigations").

The Defendants' statement that "concerns about the defense gaining access to patently irrelevant, private information about people or their families is minimal because the defense does not seek access to anyone's personal devices" is either disingenuous or naïve.  Mot. at 10.  Servers maintained by companies that employ hundreds of people and operate in competitive markets, including overseas, can of course be expected to hold all manner of private information, including documents relating to benefits, healthcare, minor dependents, vacation plans, personal conversations with colleagues, and emails with family members, to say nothing of irrelevant but commercially sensitive (and/or privileged) contracts, negotiations, proposals, and so on.  The Defendants' assertion that "the protective order into which the parties entered eliminates the risk that any sensitive information will be shared outside the defense team" hardly mitigates the myriad problems with the Defendants' proposal, including potential risks to the safety of

Torneos employees and others.  Mot. at 10; <u>see also</u> see Ex. A at 2 (describing "intolerable personal safety risk for Torneos employees and former employees" that disclosure of the server would create).[9]

The Defendants rely on a case from the Northern District of Texas – <u>United States v. McArthur</u>, No. 3:06-CR-347 (SAF), 2007 WL 2049914, at *6 (N.D. Tex. July 17, 2007) – but it does not do the work they ask of it.  The Defendants cite <u>McArthur</u> for the proposition that "it is appropriate to order the government to produce electronic devices (specifically, hard drives) in its possession for forensic examination by a defendant," but the facts of <u>McArthur</u> render the case unhelpful to the request at issue here.  First, the defendant, a physician, was charged with illegally distributing drugs to patients over the internet using the very devices he sought to inspect or obtain a mirror image of.  <u>See</u> <u>United States v. McArthur</u>, Motion and Brief for Discovery and Inspection, 2007 WL 2788121, ¶ 15 (N.D. Tex. Jan. 26, 2007).  Thus, unlike here, the devices he sought to inspect were themselves evidence of the defendant's charged crimes.  Second, the defendant sought devices that, unlike here, were already in the government's possession.  <u>McArthur</u>, 2007 WL 2049914, at *6.  Third, <u>McArthur</u> dealt primarily with the defendant's own devices,[10] and therefore the privacy and privilege concerns articulated above were not present since the defendant and his expert would be accessing his own materials.  <u>Id.</u>  <u>McArthur</u> is a far cry from the

---

[9] The government expects that, were the Court to order production of or issue a subpoena for the Requested Materials, PwC would consider filing a motion to protect its own substantial interests given the scope and nature of the Requested Materials.

[10] The case also referred to a personal hard drive belonging to a related defendant in another case, but it is unclear from the opinion and underlying briefs who that individual was or what his relationship was to the defendant or the charged case.  The court undertook no explanation or analysis regarding this individual or the reason the defendant was entitled to access to his materials, although it appears from the underlying briefs that the government intended to offer the hard drives as evidence in its case-in-chief.

proposition that Rule 16's inspection provision can be used to compel the government to force a company to turn over its entire server to a criminal defendant for a free-for-all review.

*     *     *

In sum, the government is not in possession of the Requested Materials and has already obtained and produced relevant, non-privileged documents form the sources requested by the Defendants, and there is no authority supporting the Defendants' request that the government be directed to obtain the Requested Materials.  Accordingly, the Defendants' motion for an order to compel production of the Requested Materials pursuant to Rule 16 should be denied.

II.     Lopez and Martinez's Alternative Motion for Subpoenas Should Also Be Denied

Lopez and Martinez's request for subpoenas pursuant to Rule 17 should be denied for the same reasons articulated above and because it fails to meet the requirements of relevancy, specificity, and admissibility; seeks authorization to embark on a wide-ranging fishing expedition; and ignores prior rulings by the Court in this case rejecting a far narrower request for documents from Torneos.

A.     The Requested Subpoena Is an Improper Fishing Expedition

1.     Legal Standard

Rule 17(c) "was not intended to provide a means of discovery for criminal cases." United States v. Nixon, 418 U.S. 683, 700 (1974); see also Bowman Dairy Co. v. United States, 341 U.S. 214, 220 (1951) (same).  Rather, because the rule's "purpose is trial-focused," a Rule 17(c) subpoena "may be used only to obtain materials admissible as evidence at trial."  United States v. Louis, No. 04-CR-203 (LTS), 2005 WL 180885, at *3 (S.D.N.Y. Jan. 27, 2005). Accordingly, a defendant seeking documents pursuant to a Rule 17(c) subpoena bears the burden of satisfying the "strict standard" set forth by the Supreme Court in Nixon, namely of "specifically identifying the materials sought and showing that they are relevant and admissible."  United States

17

v. Brown, No. 95-CR-168 (AGS), 1995 WL 387698, at *9 (S.D.N.Y. June 30, 1995).  More succinctly, "the party seeking issuance of the subpoena 'must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity.'" United States v. Blakstad, No. 19-CR-486 (ER), 2020 WL 5992347, at *11 (S.D.N.Y. Oct. 9, 2020) (quoting Nixon, 418 U.S. at 700); see also United States v. RW Pro. Leasing Servs. Corp., 228 F.R.D. 158, 162 (E.D.N.Y. 2005) (citing Nixon, 418 U.S. at 699-700).  A Rule 17(c) subpoena may not be used to conduct a "general 'fishing expedition.'" Nixon, 418 U.S. at 700.  Thus, it is "insufficient" for a party to show only that the subpoenaed documents "are potentially relevant or may be admissible," RW Pro. Leasing Servs., 228 F.R.D. at 162.  Requests accurately characterized as fishing expeditions "deserve[] to be quashed" on that basis alone.  United States v. Chen De Yian, No. 94-CR-719 (DLC), 1995 WL 614563, at *2 (S.D.N.Y. Oct. 19, 1995).

　　　　Consistent with these principles, a Rule 17(c) subpoena cannot be used to obtain material that could be used only, if at all, to impeach a potential government witness.  United States v. Nektalov, No. 03-CR-828 (PKL), 2004 WL 1574721, at *2 (S.D.N.Y July 14, 2004) ("[D]ocuments sought solely for impeachment purposes are not the proper subject of a Rule 17(c) subpoena."); United States v. Jasper, No. 00-CR-825 (PKL), 2003 WL 1107526, at *2 (S.D.N.Y. Mar. 13, 2003) (quashing defendant's subpoena for personnel files regarding a government witness where the documents were sought only for impeachment and would not have been admissible at trial); United States v. Iozia, 13 F.R.D. 335, 340 (S.D.N.Y. 1952) (Rule 17(c) cannot be used "to require in advance of trial, and in preparation for trial, a disclosure to the defendant of information which may tend to impeach persons the Government may or may not call as witnesses").  But see United States v. Cole, No. 19-CR-869 (ER), 2021 WL 912425, at *4 (S.D.N.Y. Mar. 10, 2021)

(noting that Rule 17 subpoena returnable at, but not before, trial may seek impeachment material, assuming other Rule 17 conditions are met).

Rule 17(c)(2) permits this Court to quash or modify a Rule 17(c) subpoena on a motion promptly made. In addition to the subpoena's recipient, the government has standing in its own right to move to quash a subpoena "based 'upon its interest in preventing undue lengthening of the trial, undue harassment of its witness, and prejudicial over-emphasis on [the witness'] credibility.'" United States v. Giampa, No. 92-CR-437 (PKL), 1992 WL 296440, at *1 (S.D.N.Y. Oct. 7, 1992) (quoting United States v. Raineri, 670 F.2d 702, 711 (7th Cir. 1982)); see also United States v. Vasquez, 258 F.R.D. 68, 71-72 (E.D.N.Y. 2009). Indeed, where the Rule 17(c) subpoena principally seeks impeachment or Section 3500 material for a key government witness, because "[t]he government has an interest in controlling the timing of disclosures" of that material, those interests "are sufficiently strong and immediate . . . to confer standing." United States v. Bergstein, No. 16-CR-746 (PKC), 2017 WL 6887596, at *3 (S.D.N.Y. Dec. 28, 2017). Moreover, even if the government does not have standing, "the Court has an independent duty to review the propriety of the subpoena – a duty in this case that requires the Court to consider whether the documents sought are privileged and whether the subpoena itself comports with the requirements of Rule 17." Vasquez, 258 F.R.D. at 72; see also United States v. Coriaty, No. 99-CR-1251 (DAB), 2000 WL 1099920, at *6 n.4 (S.D.N.Y. Aug. 7, 2000) (considering government's motion to quash third-party subpoena, notwithstanding defendant's objections on ground that government had no standing, because "it is the responsibility of the court, not the opposing party, to ensure that a subpoena secured under Rule 17(c) is for a proper purpose" (citation omitted)).

2.    <u>Discussion</u>

The Defendants' application for a Rule 17 subpoena should be rejected for failure to meet the requirements of specificity, relevance, and admissibility.  <u>See</u> <u>Blakstad</u>, 2020 WL 5992347, at *11.

The descriptions of materials sought are couched in speculative, amorphous terms that fall well short of satisfying the requirement of specificity.  <u>RW Professional Leasing Services Corp.</u>, 228 F.R.D. at 162; <u>Louis</u>, 2005 WL 180885, at *9 (party seeking documents pursuant to a Rule 17(c) subpoena must be able to "reasonably specify the information contained or believed to be contained in the documents sought" and establish both relevancy and admissibility (internal quotations omitted)). The Defendants seek access to the backup tape and server of Torneos because, they speculate, this is where "data regarding the custodians of certain materials and data regarding any deletions or alterations of materials may reside."  Mot. at 3.  At this level of generality, the statement could be made of the server of any entity that produces documents to the government – voluntarily, through cooperation, pursuant to subpoena, or otherwise.  The Defendants state that "[t]o date, some of the documents produced by the government have not included critical metadata that would allow the defense to meaningfully contextualize the information being produced," <u>id.</u> at 7, but they fail to explain how the requested metadata, to the extent it exists, would "contextualize" the produced documents, much less how such contextualization would be material to the preparation of a defense or admissible at trial.  The Defendants similarly fail to explain how the purported inconsistency between the testimony of Ms. Decker's testimony and Mr. Rodriguez supports their request.  As an initial matter, there was no inconsistency, as explained above.  But even assuming, <u>arguendo</u>, there were some inconsistency, the Defendants do not explain how that inconsistency supports compelled access to the Torneos server, through a third-party accounting firm operating under direction of counsel.

Because the Defendants do not provide any specificity as to the materials they seek, it is difficult to advance particularized arguments regarding relevance and admissibility. Suffice it to say the Defendants have not met their burden to meet those requirements either. <u>See, e.g.,</u> <u>United States v. Mendinueta-Ibarro</u>, 956 F. Supp. 2d 511, 513 (S.D.N.Y. 2013) ("[T]he party's Rule 17(c) subpoena must be able to reasonably specify the information contained or believed to be contained in the documents sought rather than merely hope that something useful will turn up." (alteration, citation, and internal quotations omitted)). Finally, the Defendants' request also seeks an end-run around this Court's prior ruling rejecting the Defendants' motion for a letter rogatory seeking access to all materials from or related to Burzaco's BlackBerry and authorizing a more limited letter rogatory seeking certain materials from the device and directing their production to the government. The Court described the Defendants' request for all materials from the device – including those that might be irrelevant, privileged, and/or of a personal nature – as "overly broad and constitut[ing] discovery requests that are improper under Rule 17(c)." Sept. 3, 2021 Order (ECF Dkt. No. 1621) at 3. Apparently dissatisfied with the Court's ruling, the Defendants now seek far broader access to a far broader universe of materials which, as discussed above, are sure to contain a large volume of irrelevant, privileged, and/or personal information.

Because the Defendants have failed to satisfy the requirements of Rule 17, their motion for a subpoena pursuant to that provision must be denied.

CONCLUSION

For the foregoing reasons, the Defendants' motion should be denied.

Dated:     Brooklyn, New York
           January 28, 2022

                                          Respectfully submitted,

                                          BREON PEACE
                                          United States Attorney

                               By:     ___/s/_____
                                          Samuel P. Nitze
                                          Patrick T. Hein
                                          Kaitlin T. Farrell
                                          Victor A. Zapana
                                          Assistant United States Attorneys
                                          (718) 254-7000