**Debevoise & Plimpton**

Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
+1 212 909 6000

January 29, 2023

<u>BY ELECTRONIC MAIL</u>

The Honorable Pamela K. Chen
Unite States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re:  <i>United States v. Hernan Lopez</i>, Case No. 15-cr-252 (PKC)

Dear Judge Chen,

      Among the most fundamental principles of our justice system is that a defendant's national origin, ethnicity, place of residence or cultural identity cannot be offered by the government as evidence that he or she had the requisite guilty knowledge of charged criminal activity.  After reciting the familiar admonition from *Berger v. United States* that although a prosecutor "may prosecute with earnestness . . . [and] strike hard blows, [the government] is not at liberty to strike foul ones," 295 U.S. 78, 88 (1935), Judge Catharina Haynes from the Fifth Circuit put it this way:  "It is hard to think of a more foul blow than implying that the . . . national origin of a group of people has anything to do with whether [the defendant] should have known they were involved in [criminal activity]." *United States v. Calhoun*, 478 F. App'x 193, 196 (5th Cir. 2012) (Haynes, J., concurring).  Concurring in the denial of certiorari, Justice Sotomayor agreed:  "Such argumentation is an affront to the Constitution's guarantee of equal protection of the laws[, a]nd by threatening to cultivate bias in the jury, it equally offends the defendant's right to an impartial jury." *Calhoun v. United States*, 568 U.S. 1206 (2013) (Sotomayor, J., concurring with denial of certiorari).

      The first thing Alejandro Burzaco said to the government about Hernan Lopez was that Lopez knew bribes were being paid because Lopez was from Argentina.  *See* 3500-AB-8(a) at 9.  The first thing Burzaco said about co-defendant Carlos Martinez was that Martinez probably knew bribes were being paid because Martinez is Mexican.  *See id*.

      To an alarming degree, that has become the prosecution's theory in this case.  The odious notion that people in or from Latin America knew about bribery in soccer in Latin America *because they are in or from Latin America* was not only part of the government's opening statement and permeates its case, but it also forms the explicit fulcrum of the defense of co-defendant Full Play Group S.A. ("Full Play"), from which Mr. Lopez and Mr. Martinez have unsuccessfully sought a severance, both during and well in advance of trial.

This double-barreled injection of prohibited ethnic stereotyping has been further exacerbated by troubling irregularities in the testimony of Alejandro Burzaco,[1] on whose word the government's case relies. After our initial arguments that Burzaco appeared to have tailored new testimony based on the defense openings, we learned that he was in fact briefed on the defense opening statements the same day they were made, before his direct examination began. We further learned that he was provided with both electronic and hard copies of the transcript of those opening statements during his direct examination, even after he had unsuccessfully sought the transcript from the government. *See* Trial Tr. at 1456:3–16. It is impossible to overstate how inappropriate those actions would be in any case, let alone this one, in which there are obvious indicia (and even a government admission[2]) that Burzaco is relating new versions of events as he goes along, even after approximately eight years and 130 prior meetings with the government. Much of the newly-minted testimony dovetails precisely with the government's allegation of a generations-long "culture of corruption" in Latin American soccer and the Full Play defense that the "evidence will show here everyone knew" of the bribery, knowledge attributed to "the entire industry." Trial Tr. at 92:24–25, 93:17. (Full Play, Opening Statement).

Equipped with knowledge of those opening statements, and of Mr. Lopez's counsel's opening statement objecting to them, Burzaco's testimony continued to evolve before our eyes at trial. And the evolution was not limited to the new and improved version of the Dean & DeLuca meeting; the previously unmentioned but crucial alleged meetings with Mr. Lopez in Fort Lauderdale in early 2010 and in the Newscorp offices in May 2010; and other testimony regarding the individual defendants' alleged knowledge and statements. Burzaco's trial testimony has also been tailored to support Full Play and the government's theory that no one in or from Latin America can do business in soccer there without being knowledgeable of (and apparently also complicit in) bribery. After Burzaco was explicitly informed of Lopez's

---

[1] As we pointed out to the Court on January 24, 2023, there are other extremely troubling irregularities. Specifically, much of Burzaco's testimony about Mr. Lopez's and Mr. Martinez's alleged personal knowledge of Burzaco's crimes strays wildly from the statements attributed to him (or made directly by him) in the 1,474 pages of "3500 material." Some of the critical testimony Burzaco gave at trial in this regard conflicts with the statements he made previously; the rest of it, including crucial meetings he claims to have had with Mr. Lopez, are not mentioned *at all* in the voluminous 3500 material. As the Court is aware, counsel for Lopez and Martinez argued forcefully that Burzaco had calculated his testimony specifically to counter arguments they made in their opening statements. As discussed in the text, we later learned he was afforded the opportunity to do just that. The Court has already promised the defense some relief based on those irregularities in Burzaco's testimony as it relates to the 3500 material. Trial Tr. 1501:6–10 (Court Conf.) ("I will either require the parties to stipulate or I will explain to the jury that there is no reference to . . . in the 302's or in [Burzaco's] prior statements that are recorded, that the parties agree to that.").

[2] The lead prosecutor has admitted that there were parts of Burzaco's testimony that even she had never heard before. *See* Trial Tr. 1510:9–19 (Court Conf.) (Ms. Farrell noting that the first time she learned that Burzaco spoke to Mr. Lopez about bribes for the first time was in Fort Lauderdale in 2010 was during his direct testimony).

counsel's rejection of this stereotype during the opening statements, the government elicited previously unstated and entirely implausible testimony from him at trial. For example, the bribery scheme went from a carefully hidden secret—something Burzaco's business partner and beloved mentor (Luis Nofal) had hidden from him for years—into something Burzaco discussed openly, even with at least one avowed enemy (Paco Casal) and one competitor (Guillermo Tabanera). *See* Trial Tr. at 2111:20-2112:24, 2037:1-3. The previously unmentioned confessions were made because, according to Burzaco, everyone in Latin America knew "it was impossible to enter [the media market] without paying bribes." Trial Tr. 2113:22.

No doubt because Burzaco's testimony about Lopez's admissions has been such a moving target and is obviously vulnerable, the government's theory of prosecution has increasingly relied on this invidiously discriminatory trope. As set forth below, it opened on the theory and has repeatedly elicited testimony to support it. It has openly distinguished between U.S. citizens, a category that includes Lopez and Martinez, and "Americans," which apparently does not. Consciously or otherwise, the government has based its case in increasingly explicit terms on this prohibited stereotype—and the Full Play defense has echoed and reinforced that repulsive theory.

As Justice Sotomayor explained in *Calhoun*, "[b]y suggesting that [national origin] should play a role in establishing a defendant's criminal intent, the prosecutor here tapped a deep and sorry vein of . . . prejudice that has run through the history of criminal justice in our Nation . . . I hope never to see a case like this again." 568 U.S. 1206. We seek the Court's intervention now so that this does not become such a case.

Set forth below are the bases in the record for our application and the case law supporting it. Based on both, we respectfully move for the following relief:

- A dismissal of the case against Hernan Lopez, with prejudice;

- In the alternative, a declaration of a mistrial in the case against Full Play; along with an order prohibiting any further evidence or suggestion, explicit or implicit, that people in or from Latin America (whether in soccer-related businesses or not) knew or must have known of the existence of bribery in professional soccer there; and

- The curative instruction included herein.

**I.     The Repeated References to Mr. Lopez's National Origin, Ethnicity, Places of Residence or Cultural Identity to Suggest Knowledge of Criminal Conduct Have Violated his Rights to Equal Protection and an Impartial Jury.**

The operative legal principle here is as straightforward as it is fundamental: A defendant's national origin or ethnicity cannot be used in any way to suggest a defendant had knowledge of the charged crimes. *See Calhoun*, 568 U.S. 1206 (citing *McCleskey v. Kemp*, 481 U.S. 279, 309 n. 30 (1987) ("[t]he Constitution prohibits racially biased prosecutorial arguments")); *see also Peña-Rodriguez v. Colorado*, 580 U.S. 206, 224 (2017) ("An effort to address the most grave and serious statements of racial bias is not an effort to perfect the jury but

to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy."). As the Court has held "[t]ime and again," "discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'" *Peña-Rodriguez* at 222–23 (*quoting Rose v. Mitchell*, 443 U.S. 545, 555 (1979)). Inflammatory statements, questions, or arguments based on ethnicity or national origin not only violate the Constitution's guarantee of equal protection but also the right to a fair trial "by threatening to cultivate bias in the jury." *Calhoun*, 568 U.S. 1206; *see also United States v. Doe*, 903 F.2d 16, 25, 29 (D.C. Cir. 1990) (reversing the defendants' convictions after the government improperly introduced evidence of their national origin and referenced their nationality in summation, noting that "[a]ppeals to racial passion can distort the search for truth and drastically affect a juror's impartiality").

This is not an issue of first impression in the Second Circuit. In *United States v. Cruz*, 981 F.2d 659, 663–64 (2d Cir.1992), a case involving Hispanic defendants, the Second Circuit held that the district court erred in admitting a DEA agent's description of the neighborhood in which the drug transactions at issue allegedly took place. The agent had described the area as "inundated with drug dealing" and stated that it had "a very high Hispanic population." *Id*. The Second Circuit vacated the convictions, holding that the "[i]njection of a defendant's ethnicity into a trial as evidence of criminal behavior is self-evidently improper and prejudicial for reasons that need no elaboration here." *Id*. at 664. More recently, in *United States v. Zhong*, the Second Circuit held that it was error for the district court to admit expert testimony that "improperly risked prejudicing the jury against [the defendant]," where the testimony "highlighted China's poor record with respect to forced labor" and where the defendant was "a Chinese man who was associated with the Chinese government." 26 F.4th 536, 557 (2d Cir. 2022).

The facts of *Calhoun* are instructive. The defendant was charged with participating in a drug conspiracy and testified in his own defense that he had detached himself from his group of friends before one of them arrived at their hotel room with a bag of money. *Calhoun*, 568 U.S. 1206. Calhoun stated that he "didn't know" what was happening and it "made me think…I didn't want to be there." On cross examination, the prosecutor pressed the defendant to explain why he did not want to be in the hotel room: "You've got African-Americans, you've got Hispanics, you've got a bag full of money. Does that tell you—a light bulb doesn't go off in your head and say, This is a drug deal?" *Id.*

Although the error was "[i]nexplicably" forfeited, both Judge Haynes at the Fifth Circuit and Justice Sotomayor (joined by Justice Breyer) condemned this question (and argument based on it) in the strongest possible terms. *Id*.; *Calhoun*, 478 F. App'x at 196. As Justice Sotomayor explained, the prosecutor's question "was pernicious in its attempt to substitute racial stereotype for evidence, and racial prejudice for reason," and both "diminishes the dignity of our criminal justice system and undermines respect for the rule of law." *Calhoun*, 568 U.S. 1206.

The same principle animated the Second Circuit's recent reversal in *Zhong*. There, the defendant, a former Chinese diplomat and head of U.S. operations for a Chinese construction company, was tried on forced labor charges; in support, the government offered expert testimony that generalized Chinese forced labor operations and "China's human rights record with respect to forced labor." *Zhong*, 26 F.4th at 557. As the Second Circuit explained, the testimony impermissibly reinforced the notion that China's forced labor operations were a "routine problem"

and likened Zhong's alleged acts to atrocities *others* committed in Zhong's home country (*e.g.*, "reeducation through labor camps . . . for the Muslim community from the Uighur subgroup"). *Id*. at 557. The government relied on this opinion testimony in its closing statement, further buttressing the likelihood of improper stereotyping by the jury. *See id*. at 559.

The Second Circuit reversed the convictions, finding that "unfair prejudice" resulted from the admission of this broad-brush expert testimony because it "improperly invited the jury to find Zhong guilty by association." *See* 26 F.4th at 558; *see also Cruz*, 981 F.2d at 663 (noting that "guilt may not be inferred from the conduct of unrelated persons"). Thus, as *Zhong* makes clear, in addition to being rooted in the Constitution, the patent unfairness in the form of appealing to ethnic bias is also embodied in Federal Rule of Evidence 403, which provides that "[u]nfair prejudice" includes "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 Advisory Committee Notes.

**II.     The Cumulative Effect of the Trial Record, Including Burzaco's Testimony and Full Play's Defense, Justifies the Requested Relief.**

We set forth below the numerous instances in which, both explicitly and implicitly, prohibited testimony has been elicited and arguments have been made before the jury so far, to the effect that Mr. Lopez knew or is more likely to have known about the existence of the charged bribery scheme because he was born in Argentina. The cumulative effect of these improper suggestions, together with the myriad ways in which Burzaco has calculated his testimony to respond to information he improperly obtained, has prejudiced Mr. Lopez and compromised his rights to equal protection and a fair trial by an impartial jury.

- **The Government opened on a theory that Mr. Lopez and Mr. Martinez joined a "culture of corruption" in soccer in Latin America that had lasted through "generations of leaders."** Trial. Tr. at 71:24-72:3 (Gov't, Opening Statement).

- **Defendant Full Play opened on a defense that 'everybody knew' about the alleged bribery scheme in South America.**
    - Trial Tr. at 83:20–25 (Full Play, Opening Statement) ("The evidence will show that these payments are party of a **generation long business custom** . . . These payments were institutionalized. To use the government's own words, systematic." (emphasis added)).
    - Trial Tr. at 84:6–9 (Full Play, Opening Statement) ("This was happening in South America, with South American people, [S]outh American contracts, South American media regarding South American soccer. That is what is at issue in this case.").
    - Trial Tr. at 92:24–25 (Full Play, Opening Statement) ("The evidence will show here everyone knew.").
    - Trial Tr. at 93:11–21 (Full Play, Opening Statement) ("These payments were expected . . . [a]nd let me tell you something else, this knowledge – the evidence will show that **this knowledge** . . . **extended to the entire industry**. It extended to media companies. **You're going to hear some other folks testify from the media companies. They will tell you that they all knew.**" (emphasis added)).

- o   Trial Tr. at 93:25–94:4 (Full Play, Opening Statement) ("The evidence will show there was no deceit and the evidence will show that there was no fraud. Against this backdrop of a **long-standing business custom**, surely the Government must be claiming that the prohibition was clearly set out somewhere." (emphasis added)).

- **Lopez's opening explicitly disagreed with the "blunderbuss," "broad brush" approach of both the government and the Full Play openings, which suggested that "everybody down there in South America must be guilty."** Trial Tr. at 145:9–18 (Lopez, Opening Statement).

- **Burzaco's attorneys provided him with information about Defendants' opening statements prior to him taking the stand.**
    - o   Trial Tr. at 1921:18–23 (Sealed Side Bar) ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
    - o   "At approximately 10:00 p.m. or 11:00 p.m. on January 17, 2023, the day that all parties gave their opening statements, [Burzaco's] U.S. counsel orally conveyed to [Burzaco] statements made by the defense during their opening statements, namely, that:
        - the Dean & DeLuca meeting was fabricated by [Burzaco];
        - there were a number of other meetings and phone calls that were fabricated by [Burzaco];
        - [Burzaco] lied about everything;
        - Full Play's attorney made a comment that everyone knew about the bribery, and there appeared to be tension between the defendants on this issue because it tended to implicate Defendants Lopez and Martinez." Dkt. 1908, at 4.

- **When asked about bribes on direct examination, Burzaco testified that Mr. Lopez knew "how things were done in Latin America" and suggested that Mr. Lopez was permitted to partake in the bribery scheme on account of his national origin.[3]**
    - o   Trial Tr. at 652:16–19 (Direct Ex. of A. Burzaco) ("Q: Specifically, what did Mr. Lopez say about bribes? A: He said that he's been operating as a business manager at Telemerica for a long time and that he knew how things are done in the soccer world, in Latin America . . .")

---

[3] This is not the first time that Burzaco has put Defendants Hernan Lopez and Carlos Martinez's national origin at issue. According to a 302 report produced by the government, Mr. Lopez and Mr. Martinez knew, or should have known, about the bribery simply because they are from Argentina and Mexico, respectively. *See* 3500 AB-8(a), at 9. Even where national origin is not on the record, Burzaco has concluded that individuals from Latin America, "as they say also in the Government, [] should have known or [] knew" about the bribery scheme. Trial Tr. 2220:6-7 (Direct Ex. of A. Burzaco) (referring to Marcela Martin).

- o   Trial Tr. at 775:22-776:6 (Direct Ex. of A. Burzaco) ("Q: And do you recall what you told [Julio Grondona]? A: **I told him . . . that [Hernan Lopez] was from Argentina** . . . He was aware, he was aware someone from Argentina was my counterparty and he said fine, yes." (emphasis added)).

- **During Burzaco's direct examination, the government repeatedly invoked the word "American," and Burzaco consistently referenced citizenship.**
    - o   Trial Tr. at 590:20–591:1 (Direct Ex. of A. Burzaco) ("Q: And in sum and substance . . . [Grondona] said to you, you haven't been paying me bribes in connection with the men's first division rights, and so I don't owe you anything, it's not a betrayal . . . And I asked you **whether you had shared that anecdote with your American partners**, is that right?" (emphasis added)).
    - o   Trial Tr. at 687:5–9 (Direct Ex. of A. Burzaco) ("Q: Who is Emiliano Saccone? A: **He's an Argentine citizen working for Fox in California**, if I'm correct. And he was more involved with production of different channels, and in particular, I remember he was involved in the production of the channel in Colombia." (emphasis added)).
    - o   Trial Tr. at 771:5–21 (Direct Ex. of A. Burzaco) ("Q: And to what extent at all did you discuss concerns about other people or **other Americans** knowing about the bribes? A: He asked me if Bruce Churchill who, he's an old Fox employee, now head of DirecTV and the most senior person supervising the investment of DirecTV in Torneos, he asked me if Bruce Churchill knew about T&T Netherlands, very small price for Globo, it's like a bright light in the sky or a red light, and he was concerned that David Haslingden, being a good old friend of Bruce Churchill…might learn of the bribes through Bruce Churchill." (emphasis added)).
    - o   Trial Tr. at 885:18–25 (Direct Ex. of A. Burzaco) (Q: "**Did you ever discuss with the CONMEBOL executives whether having American executives, in particular, posed a problem**? A: I wouldn't even envision having that conversation because they would think, like, I'm coming from a different planet to say, Oh, look, I had a good idea: Why don't we bring American executives to the bribe discussions? It would be something totally outside of a regular conversation with a soccer executive of CONMEBOL." (emphasis added)).
    - o   Trial Tr. at 1337:1–7 (Direct Ex. of A. Burzaco) ("**Q: Besides just being a U.S. citizen, was [Chuck Blazer] an American? A: Yes. He was an American. Q: Where was he from? A: From the United States.** Q: Do you know where in the U.S.? A: I know his office was in, in, on 5th Avenue on Trump Tower." (emphasis added)).
    - o   Trial Tr. at 1340:8-17 (Direct Ex. of A. Burzaco) ("A: [D]ue to that circumstance, he was in very deep trouble in the U.S., that he couldn't leave the U.S. and that among other–that he was in that circumstance because Blazer, the person I mentioned before . . . Q: **The American?** A: The American I described . . ." (emphasis added)).

- **Burzaco's testimony was influenced by the "presentation of the government."[4]**
    - Trial Tr. at 2029:15–21 (Cross Ex. of A. Burzaco) ("A: I don't remember very well my first meeting. My second meeting—I don't remember if you're speaking about a specific meeting, but I never said that to the government, and **even if I would have had a mental lapse and I forgot Martinez and Lopez, today, after seeing all the presentation of the government,** I would have felt – feel guilty of not saying the truth." (emphasis added)).

- **Burzaco requested the trial transcript from the government, and the government refused.**
    - Trial Tr. at 1456:13–14 ("I'll just say [Burzaco] actually asked us for a copy of his testimony [from this trial] and **we told him no**." (emphasis added)).

- **Even after the government had refused his request, Burzaco obtained a copy of the trial transcript from his attorneys, including Defendants' opening statements, prior to his cross-examination.**
    - On Friday, January 20, 2023, Burzaco received from his counsel, via email, a PDF copy of the trial transcript, which included the opening statements made by defense counsel. Dkt. 1908, at 4.
    - On Saturday, January 21, 2023, Burzaco received from his counsel a hard copy of the transcript that, like the emailed copy, included the opening statements made by defense counsel. Dkt. 1908, at 4.

---

[4] Burzaco appears to have tailored his testimony based on the parties' jury selection, opening statements, key documents and various sidebar discussions. *See* Dkt. 1910, at 1–2.

For example, Burzaco alone has made 29 references to "Qatar," attempting to cast broad aspersions of corruption on the world of soccer—many of them after the Court's curative instruction in this regard, which was given prior to Burzaco's receipt of the trial transcript, Trial Tr. 681:2-10—compounding the prejudice that Defendants Lopez and Martinez face as a result of being from and operating a business within Latin America. *See, e.g.,* Trial Tr. at 344:13, 649:8, 676:2, 676:3, 676:22, 676:24, 677:10, 765:17, 780:5, 783:23, 784:24, 841:6, 895:2, 895:20, 895:25, 909:20, 909:21, 910:1, 928:24, 1183:23, 1184:9, 1184:12, 1184:20, 1186:10, 1210:21, 1690:9, 1772:14, 2342:25, 2344:13. In a wholly irrelevant reference to Qatar winning as the host city for the 2022 World Cup, Burzaco testified: "[i]t was like the FIFA executive committee writing in the clouds in the sky, we are open for Bribes." Trial Tr. 676:6-22 (Direct Ex. of A. Burzaco). Despite the Court's conclusion that the parties "should avoid . . . casting broad aspersions on the professional soccer world" and refrain from talking about the bidding process for the host city of the 2022 World Cup, Trial Tr. 680:1–681:10 (Sidebar), Burzaco continued to reference Qatar, in efforts to bolster his broadside claims of widespread knowledge of corruption. Trial Tr. 765:17, 783:23, 784:24, 841:6, 895:2, 895:20, 895:25, 909:20, 909:21, 910:1, 928:24, 1183:23, 1184:9, 1184:12, 1184:20, 1186:10, 1210:21, 1690:9, 1772:14, 2342:25, 2344:13.

- **Burzaco made culturally prejudicial statements during his cross-examination.**
    - Trial Tr. at 1587:20–25 (Cross Ex. of A. Burzaco) ("A: While I work at Citibank I was not paying bribes and was not doing any criminal activity. Q: Not even tax evasion? A: Maybe. Because i**n Argentina tax evasion is part of the normal life**." (emphasis added)).
    - Trial Tr. at 1590:12–19 (Cross Ex. of A. Burzaco) ("Q: But Mr. Burzaco, you knew that participating in a bribery scheme was going to risk that you could get caught and go to jail, right? A: In 2004 I didn't have that perception and in 2004 most business I would look, for example, in the energy sector, which I have even more experience than in media, I would have to face – **in order for me not to end up here, I would have had to move out of Argentina in 2001.**" (emphasis added)).
    - Trial Tr. at 2113:2–7 (Cross Ex. of A. Burzaco) ("A: They already knew that this scheme was put together because Tabanera is a well-known or **experienced media guy sitting in Argentina. He knows that he cannot go to CONMEBOL unless paying bribes.** And he has been suffering these restrictions over the years. And they have decided not to wet their feet into the dirty waters.[5] (emphasis added)).
    - Trial Tr. at 2113:17–24 (Cross-Ex. of A. Burzaco) ("A: . . . I was sharing these with my friend Guillermo Tabanera, which, by the way, is the head of ESPN, and who have abstained from competing these rights knowingly – knowingly, as many people in the media market, although—knowingly that there was a bribe scheme, and it was impossible to enter without paying bribes . . . ")

- **Full Play's cross-examination of Burzaco explicitly reinforced the impermissible suggestions Burzaco has injected throughout his testimony.**
    - Trial Tr. at 2351:10–14 (Cross Ex. of A. Burzaco) ("Q: And, we've heard, I believe, I guess it was a great deal of testimony that when you dealt in these organizations, **you had to be very careful about how you dealt with your U.S. partners; is that fair to say, or U.S. executives**? A: Very careful, maybe is careful." (emphasis added)).
    - Trial Tr. at 2352:11–15 (Cross Ex. of A. Burzaco) ("Q: And, sir, is it fair to say that you would be more careful or very careful with respect to conversations you had with certain U.S. executives than you would have with these CONMEBOL executives in the pictures here? A: In general terms, that's correct.").

---

[5] Burzaco's comment referencing "dirty water" appears to be in direct response to Lopez's counsel's opening: "The one thing the two openings you've already heard had in common is this. It's in the water, this blunderbuss where everybody knew. Apparently, Full Play had knowledge of these bribes and, apparently, it sees an advantage in saying that everybody had knowledge of these bribes but you know what? That's news to us. We're not going to stand here and tell you blunderbuss who did have knowledge and who didn't. I'm going to walk through the evidence that you'll hear with me. I'm going to give you an opening statement, not this broad brush everybody down there in South American must be guilty. We're going to walk through the evidence." Trial Tr. at 145:8-18 (Lopez Opening Statement).

- Trial Tr. at 2352:22–2353:5 (Cross Ex. of A. Burzaco) ("Q: And I think at one point in your testimony you said that it would not be a very good idea to bring American or U.S. executives—excuse me—because South America is, of course, part of America—but **it would not be a good idea to bring United States executives into a CONMEBOL meeting, right**? I think you said that would not be a good idea, correct? A: In—in particular to the meetings where illegal discussions would place, more than to CONMEBOL meetings in general." (emphasis added)).
- Trial Tr. at 2356:17–2357:13 (Cross Ex. of A. Burzaco) ("Q: Yes. I'm talking about–I believe you were discussing how things were in Argentina when you said this is the reality of where I live. In context, you were describing business in Argentina when you said this is the reality of where I live . . . What did you mean by that? . . . A: **It was very difficult to grow in any business without having to commit some type of illegal act**, some sort of on the way, and I don't want to minimize my responsibility with that, but probably **the only way, especially in soccer, to…have been able to conduct business in Argentina, is more or less like ESPN did, without entering into the soccer market of Latin America**." (emphasis added)).
- Trial Tr. at 2358:16–2359:6 (Cross Ex. of A. Burzaco) ("Q: So because of that, is that a reason why businesses like Torneos with thousands employees may want to keep their financial affairs more discrete in Argentina? A: That's one of the reasons. That's also a reason is to create subsidiaries outside Argentina in order for all businesses that you conduct outside of Argentina to collect them there, and in Argentina until the money doesn't flow into Argentina, you wouldn't have to pay taxes, and you would keep the dollars as in the value of the dollars and not be obliged to sell them at half its price. Q: So is it fair to say, Mr. Burzaco, that the way businesses conduct their financial affairs in Argentina, is different than the way businesses conduct their financial affairs here in New York or Brooklyn?" (objection sustained)).
- Trial Tr. at 2354:22–2355:4 (Cross Ex. of A. Burzaco) ("Q: So I think as you said, things were different in and your discussions were different about these payments when you were discussing them, you could be more open when you were discussing with all of the individuals here on these pictures, correct? A: More open than to whom? Q: Than to the U.S. executives. Correct? A: It was more brutal, the conversation or more direct.")
- Trial Tr. 2364:9–2365:1 (Cross Ex. Of A. Burzaco) ("Q: [Casal], he owned GolTV, correct? A: Yes. And also an operation in Uruguay. Q: In Uruguay, okay. But they're not a U.S. company either, correct? A: They had a U.S. company because they also have a distribution in the U.S. through GolTV. Q: Oh, through GolTV, okay. But most of their operations, though, are in Uruguay; is that correct? A: They had an operation in Uruguay since more or less 25 years ago, and then they have these Spanish-speaking channel with some distribution in the U.S. and small distribution, like Mr. Sarratt explained, in Latin America. Q: Okay. And is it fair to say that—and you mentioned, too, that he was a person who also made payments to soccer executives, correct? A: That's correct.").

- **As the Court observed, Burzaco completely changed his demeanor at the commencement of Full Play's cross-examination, given his knowledge that Full Play's defense aligns with the government's theory of the case against Lopez and Martinez.**
    - Trial Tr. at 2408:6 (Court Conf.) (recognizing this change in Burzaco's demeanor and referring to Mr. Ortiz as "the witness whisperer").

- **The government explicitly endorsed Full Play's prejudicial cross-examination on the record.**
    - Trial Tr. at 2390:6–19 (Court Conf.) (The gov't: "What I heard Mr. Ortiz to be asking or doing in his **line of cross which I thought was effective**, was **drawing a distinction between American companies and American executives and people doing business only in South America** and he certainly did not ask questions that directly implicated in any way the two co-defendants sitting here which goes back to Your Honor's original ruling at start of trial on this issue, which is it's not directly adverse if he's not implicating these two individuals; and not only is he not doing that, but **he seems to be clearly drawing a distinction between American companies and American executives and then those who only operate in South America** which I think kind of–obviously our theory of the case doesn't agree with that but from the defense perspective it carves off the other two co-defendants." (emphasis added)).

III.    **The Court Has Authority to Address these Constitutional Violations by Dismissing the Indictment on Due Process Grounds or Pursuant to its Supervisory Powers.**

We believe the record in this case justifies the extraordinary relief of dismissing the indictment against Mr. Lopez, based on both (1) the repeated and explicit suggestions to the jury by the government's key witness that Mr. Lopez knew or is more likely to have known of the bribery scheme because he was born in Argentina and (2) the explicit arguments to that effect from co-defendant Full Play. *See United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997) ("The concept of fairness embodied in the Fifth Amendment due process guarantee is violated by government action that is fundamentally unfair or shocking to our traditional sense of justice, . . . or conduct that is so outrageous that common notions of fairness and decency would be offended were judicial processes invoked to obtain a conviction against the accused.") (internal quotation marks and citations omitted); *see also United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) ("[I]f the government violates a protected right of the defendant, due process principles may bar the government from invoking the judicial process to obtain a conviction, if the government's conduct reached a demonstrable level of outrageousness.") (internal quotation marks and citations omitted).

In the alternative, the Court should exercise its authority to dismiss the indictment as to Mr. Lopez pursuant to its supervisory powers "to prevent parties from reaping benefit or incurring harm from violations of substantive or procedural rules (imposed by the Constitution or laws)." *United States v. Williams*, 504 U.S. 36, 46 (1992); *see also Cupp v. Naughten*, 414 U.S. 141, 146, (1973) (recognizing the supervisory power of federal courts); *McNabb v. United States*, 318 U.S. 332, 341 (1943) (recognizing supervisory powers in criminal cases); *United States v. Hogan*, 712 F.2d 757, 761–62 (2d Cir. 1983) (district courts may exercise supervisory authority

to dismiss an indictment); *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) ("A district court can dismiss an indictment under its supervisory powers even if the conduct does not rise to the level of a due process violation.") (internal quotation marks and citations omitted).

As the Second Circuit has acknowledged, a federal court, "guided by considerations of justice, may exercise its supervisory powers to formulate procedural rules not mandated by the Constitution." *United States v. Ming He*, 94 F.3d 782, 792 (2d Cir. 1996) (internal quotation marks and citations omitted). In exercising its supervisory power to dismiss an indictment, dismissal may be justified either to "eliminate prejudice to a defendant in a criminal prosecution," to "help translate the assurances of the United States Attorneys into consistent performances by their assistants," or both. *United States v. Brown*, 602 F.2d 1073; 1076–77 (2d Cir. 1979) (quoting *United States v. Fields*, 592 F.2d 638, 646–47 (2d Cir. 1978)). One function of the court's supervisory powers is to "protect[] the integrity of the federal courts" by ensuring that it does not itself become an "accomplice[] in willful disobedience of law." *Bundy*, 968 F.3d at 1030 (citing *McNabb*, 318 U.S. at 345).

Particularly in light of the Second Circuit's recent reversal of the convictions in *Zhong* on similar grounds, 26 F.4th 536, 557 (2d Cir. 2022), we respectfully submit that the extraordinary remedy of dismissal is warranted here.

**IV.     In the Alternative, Because Full Play's Defense Is Patently Antagonistic to the Defense of Mr. Lopez, Full Play Should Be Severed from the Trial.**

Federal Rule of Criminal Procedure 14(a) gives the district court discretion to sever co-defendants' trials where the prejudice resulting from a joint trial "is sufficiently severe to outweigh the judicial economy that would be realized by avoiding multiple lengthy trials."[6] *United States v. Walker,* 142 F.3d 103, 110 (2d Cir. 1998).

"Sufficiently severe" prejudice arises where co-defendants present antagonistic defenses such that "the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant." *United States v. Carpentier,* 689 F.2d 21, 28 (2d. Cir. 1982). Although "[m]utually antagonistic defenses are not prejudicial per se[,]" the Second Circuit has determined that "mutually antagonistic or irreconcilable defenses may be so prejudicial in some circumstances as to mandate severance." *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir.1998) (internal citations and quotations omitted). In *United States v. Serpoosh*, for example, the Second Circuit reversed the district court's denial of the defendant's severance motion on mutually antagonistic grounds, noting that

---

[6] The interests of economy so far appear to be minimal. Burzaco's testimony regarding the individual defendants and Full Play was largely not overlapping. The government has also recently indicated that they intend to call another substantial witness, Mr. Webb, a CONCACAF official who had no interactions with the individual defendants. Another significant cooperating witness, Zorana Danis, had no interactions with the individual defendants. These witnesses presumably would not be called in a trial only against the individual defendants; Burzaco's trial in a separate proceeding against Full Play would also likely be significantly shorter than in the current proceeding.

the "sparring between counsel" and credibility attacks during summation "greatly enhanced" the resulting substantial prejudice.  919 F.2d 835, 838 (2d Cir. 1990).

Courts in this district also have found that severance is warranted where, as here, "under the unique circumstances presented, trying the defendants together would present a serious risk that [one] will not receive a constitutionally fair trial."  *United States v. Shkreli*, 260 F.Supp.3d 247, 256 (E.D.N.Y. 2017); *United States v. Copeland*, 336 F.Supp.2d 223, 224–25 (E.D.N.Y. 2004) (granting defendant's severance motion and noting that "[t]he jury may convict [one defendant] based upon either the government's theory or [the other defendant's] theory."  This "serious risk" rises to the level of a "legally cognizable prejudice" when a defendant in a joint trial is subject to "double prosecution"—prosecution by both his co-defendant and the government.  *See Shkreli*, 260 F.Supp.3d at 256 (granting severance on a finding that the "jury's ability to make a reliable judgment maybe affected by the compounded effect of hearing the government's case in chief twice, once from the government and then again from [a co-defendant]"); *see also Zafiro v. United States*, 506 U.S. 534, 539 (1993).  That is precisely the case here, as Full Play is pursuing a defense that the government itself is constitutionally prohibited from presenting.

   **A.  Severance is Required Because Full Play Has Become a Second Prosecutor of Lopez.**

Mutually antagonistic defenses are deemed prejudicial where defense counsel becomes a "'second prosecutor,' who 'in order to zealously represent his client . . . [does] everything possible to convict the other defendant.'"  *United States v. Volpe*, 42 F.Supp.2d 204, 210 (E.D.N.Y. 1999) (quoting *United States v. Tootick*, 952 F.2d 1078, 1082 (9th Cir. 1991)).  As articulated by the Ninth Circuit, and as here, "[the] existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the government prosecutor."  *Tootick*, 952 F.2d at 1082.  Unlike where defendants only argue *allegedly* antagonistic defenses pre-trial, here "[t]he presentation of the codefendant's case [has] become[] a separate forum in which the defendant is [being] accused and tried."  *Id*.  The prejudice is most apparent where it creates the risk that the "government's case becomes the only unified and consistent presentation" and "presents the jury with a way to resolve the logical contradiction inherent in the defendants' positions;" in other words, "[w]hile the defendants' claims contradict each other, each claim individually acts to reinforce the government's case."  *Id*.

Full Play's articulated defense—that the culture of corruption in soccer in Latin America is so pervasive that anyone from there or doing business there necessarily has knowledge of the charged conduct and could not possibly have been defrauded by the scheme—both dovetails with the government's opening statement and is patently antagonistic to the defense of Mr. Lopez and Mr. Martinez.  The jury cannot logically credit the core rationale of Full Play's defense (that everyone from Latin America knows soccer rights are secured by bribery) and also find that Mr. Lopez and Mr. Martinez (both of whom were born in Latin America and did business there) did not know about the bribery scheme.  *See* Trial Tr. at 83:20–:25, 84:6–:9, 92:24–25, 93:11–21, 93:25–94:4 (Full Play, Opening Statement).  Full Play should accordingly be severed because "the jury, in order to believe the *core* of the testimony offered on behalf of [Full Play], must necessarily disbelieve the testimony offered on behalf of [Mr. Lopez and Mr.

Martinez]." *Carpentier*, 689 F.2d at 28 (internal citations and quotations omitted) (emphasis added).

Even more concerning is the looming threat of a double prosecution aligning against Mr. Lopez and Mr. Martinez—based on a theory that the government itself is squarely prohibited from pursuing under the Equal Protection Clause and the Due Process Clause. The record outlined above makes clear that the government both opened on a generations-long "culture of corruption" and adopted and deployed Full Play's ethnically-charged theory of defense to such an extreme that it has essentially deputized Full Play as a second prosecutor, creating a "serious risk that the jury [will] be prevented from making a reliable judgment about guilt or innocence even with limiting instructions by the court." *Shkreli*, 260 F.Supp.3d at 256. The government's embrace of this theory of defense has been seamlessly supported by Burzaco, who was read into the "tension" between Full Play and defendants Lopez and Martinez by his counsel and given access to the transcripts. *See* Trial Tr. at 1918:7–19, 1921:18–23 (Sealed Side Bar). He immediately appeared to be a changed witness on cross-examination by counsel for Full Play, as the Court observed. *See* Trial Tr. at 2351:10–14; 2352:11–15; 2352:22–2353:5; 2356:17–2357:13; 2358:16–2359:6; 2354:22–2355:4; 2366:9–2365:1 (Cross Ex. of A. Burzaco).

The "unique circumstances" here—a dark specter of insidious national-origin and ethnic bias that is wholly inadmissible and has no place in an "American" court room, jeopardizing two individual defendant's constitutional right to a fair trial—clearly surpass even the high bar required for severance.

### B. The Impermissible Prosecution Theory Espoused by Full Play is Extraordinarily Prejudicial.

Substantial prejudice exists where, as here, evidence that is admissible only given the nature of a joint trial "in some way affect[s] the jury's ability fairly and rationally to evaluate the evidence of … guilt [of each defendant]." *United States v. Tuzman*, 301 F. Supp. 3d 430, 444–45 (S.D.N.Y. 2017) (citing *United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996)). When considering whether severance is warranted to avoid undue prejudice as to one co-defendant, the Second Circuit has recognized that "relief by severance may be more appropriate" when the evidence as to that defendant is both inadmissible and inflammatory because "the risk of substantial prejudice is greater." *United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991). In affirming the denial of a defendant's motion for severance on "guilt by association" grounds, the Second Circuit considered whether the evidence would have been admissible against the defendant who played the more minor role had the defendants been tried separately. *Id*. Focusing on the evidence that would *not* have been admissible against the less culpable defendant, the Court "recognize[d] [the defendants] may have suffered some prejudice when they were forced to sit before the jury for over a month without any evidence being introduced concerning their activities." *Id*. Although the Court determined that severance was not warranted, it noted that "relief by severance may be more appropriate when the unrelated evidence reflects activities of a violent nature because the risk of substantial prejudice is greater." *Id*. The arguments advanced by Full Play would be wholly irrelevant and inadmissible in a trial against Mr. Lopez.

Full Play has already moved for severance on the grounds that it too faces the unfair threat of a double prosecution. In its response joining in co-defendants' motion for severance filed on July 24, 2020, Full Play argued that "[t]rying FPG together with Defendants Lopez and Martinez places an 'unfair and heavy burden' on Full Play, who will be forced at a joint trial to defend itself against what will be, in effect, prosecution from both the government and its co-defendants." Dkt. 1423, at 7. The threat of double prosecution against Full Play, it argued, arises from "the sheer volume and complexity of the allegations against FPG . . . versus the essentially sole allegation against Martinez and Lopez, [which] forces Martinez & Lopez to constantly point to the absence of evidence against them to convince the jury that their competitors, including FPG, engaged in illegal conduct. For the jury to hear these allegations against FPG from their co-defendants, as well as the government, over a multi-week trial, is simply unfair." *Id.* at 7–8.

As the Second Circuit has made clear, "there are limits to the risks a co-defendant must endure." *United States v. Figueroa*, 618 F.2d 934, 944 (2d Cir. 1980). Where, as here, there is a serious problem going to the fundamental fairness and admissibility of the same evidence—indeed the same constitutionally impermissible theory of guilty knowledge—being proffered by both a co-defendant and the government, the prejudicial effect on the individual defendants clearly outweighs any interest in efficiency. *See id.* at 945.

**V.    At a Minimum, the Court Should Give a Curative Instruction Making Clear that the Defendants' National Origin, Ethnicity, Places of Residence or Cultural Identity Cannot Be Considered as Evidence of Knowledge of the Charged Crimes.**

At a minimum, and regardless whether the Court severs Full Play from the trial at this stage, Mr. Lopez respectfully requests that the Court promptly give a curative instruction to address the improper testimony from Burzaco and the suggestions and arguments from Full Play to the same effect.

<u>**Proposed Curative Instruction**</u>

> In light of some of the testimony and arguments you have heard in this case, I want to give you a cautionary instruction at this time. Under our Constitution, a defendant in a criminal case is presumed innocent and entitled to equal protection of the laws. This means that you must not consider a defendant's national origin, ethnicity, places of residence, or cultural identity in any way whatsoever as you evaluate the evidence in this case. In particular, I instruct you that the national origin, ethnicity, places of residence or cultural identity of a person or group of people has nothing whatsoever to do with whether any defendant had knowledge or awareness of any criminal activity. To the extent there has been testimony in this case suggesting that people from a certain country or region, or of a particular cultural background or ethnicity, are more or less likely to have known about the existence of any criminal conduct, I instruct you now that you must completely disregard and ignore such testimony or suggestion,

> because to consider it in your deliberations would undermine the guarantee of equal protection in our Constitution, the presumption of innocence, and each defendant's right to a fair trial before an impartial jury.
>
> You will also notice that representatives and counsel for defendant Full Play Group are no longer here in the courtroom. They will not be part of the trial going forward. You should not speculate about the reasons for that. I will reiterate, however, that the questions and arguments of counsel are not evidence in this case. Because Full Play is no longer a party in this trial, you should disregard the statements and arguments of Full Play's counsel completely, particularly in light of the instruction I have just given you.
>
> As I've mentioned, I will give you more detailed instructions about your deliberations at the end of the case.

\* \* \*

Consistent with this instruction, and the authorities cited herein, the Court should also direct the parties, and through the parties their witnesses, to refrain from any improper suggestions or arguments based on prohibited factors, such as national origin, ethnicity, places of residence, or cultural identity, throughout the remainder of the trial.

## VI. Conclusion

For the foregoing reasons, the Court should dismiss the indictment as to Mr. Lopez with prejudice pursuant to both the Due Process Clause and the Court's supervisory powers. In the alternative, the Court should sever Full Play from the trial and proceed with trial as to Mr. Lopez. In the event the Court decides to continue the trial as to Mr. Lopez, we respectfully request that the Court promptly (as well as at the conclusion of the trial) give the requested curative instruction and direct the parties (and through the parties, their witnesses) to refrain from any

improper suggestions that Mr. Lopez knew or was more likely to have known about the charged crimes because of his national origin, ethnicity, former place of residence, or cultural identity.

                              Respectfully submitted,

                        /s/  David Sarratt
                            David Sarratt
                            John Gleeson
                            Sarah H. Wolf
                            Michael C. McGregor
                            Rebecca M. Urquiola
                            dsarratt@debevoise.com

                            Debevoise and Plimpton
                            66 Hudson Boulevard
                            New York, New York 10001
                            Tel: (212) 909-6000

                            *Counsel for Hernan Lopez*