UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> HERNAN LOPEZ, <br><br>    Defendant. | CASE NO. 15-cr-252 (PKC) |

**DEFENDANT HERNAN LOPEZ'S REPLY MEMORANDUM IN SUPPORT OF HIS MOTION FOR A JUDGMENT OF ACQUITTAL**

DEBEVOISE & PLIMPTON LLP
David Sarratt
John Gleeson
Sarah Wolf
Katherine Stein

*Counsel for Hernan Lopez*

## PRELIMINARY STATEMENT

After eight years, the FIFA prosecutions feel like history unto themselves by this point. But the stark fact is there is no precedent for the novel theory of honest services fraud on which this case rests. And precisely because there is no firmly rooted precedent for it, the prosecution of foreign commercial bribery as honest services fraud—in which the charged corruption supposedly deprives a foreign employer of the honest services of its foreign employee—cannot be among the "core" of intangible rights cases Congress sought to revive in enacting 18 U.S.C. § 1346. *See Skilling v. United States*, 561 U.S. 358, 404 (2010).

The government largely avoids this issue in its response. Instead of confronting Lopez's statutory argument, the government belabors points not in dispute, such as the historical pedigree of domestic cases of commercial bribery or the incidental uses of the U.S. wire systems in connection with the charged scheme. Only in a footnote (Gov't. Opp. at 44 n. 6) does it acknowledge that "[t]o date, no Court of Appeals or Supreme Court opinion has suggested that the fraudulent scheme, as opposed to the wire use, must be domestic." But the negative implication of this is more significant: nor has any Court of Appeals or the Supreme Court held that § 1346 applies to the "honest services" a foreign employee owes to a foreign employer. The Second Circuit expressly reserved the question in *United States v. Napout*, 963 F. 3d 163, 183–84 (2020), calling it "unsettled, at best," and the district court in *United States v. Giffen*, 326 F. Supp. 2d 497 (S.D.N.Y. 2004) expressly held that Congress did not intend to criminalize foreign bribery in adopting § 1346.

The government's reliance on domestic use of the wires, although relevant to extraterritoriality generally, is not responsive to the statutory interpretation argument presented here about the scope of § 1346. The use of the wires does nothing to define a crime. One can scarcely go ten seconds in any commercial activity without using the wires. Such use can

establish a basis for federal (as opposed to state) jurisdiction, but the criminal conduct Congress sought to punish must be defined by the nature of the scheme to defraud.

The government barely addresses the tide of intervening decisions (issued before it filed its brief) that clearly suggest its novel theory, when weighed on appellate review, will be found wanting. The concern animating those cases, all of which reject creative attempts to expand the reach of the wire and mail fraud statutes, is that "the fraud statutes do not vest a general power in the Federal Government to enforce (its view of) integrity in broad swaths of state and local policymaking," much less across the globe, and must not be construed "in a manner that leaves [their] outer boundaries ambiguous." *Ciminelli v. United States*, 143 S. Ct. 1121, 1126 & n. 4 (2023) (internal quotation marks omitted). Domestic bribery and foreign commercial bribery have long been treated as substantively different, as both the text and structure of the federal bribery statutes, as well as decades of precedent (and the lack of it) make clear. In light of these recent precedents, *Giffen* remains squarely on point, and perfectly anticipated the analysis prescribed by *Skilling* and the recent cases applying it.

The government's other arguments similarly miss the point. A jury could not reasonably have inferred that Mr. Lopez knew or specifically intended to deceive CONMEBOL when the evidence established that every CONEMBOL representative was, at minimum, aware of the payments. In addition, the government improperly attempts to reformulate the charged

conspiracy into a different, new conspiracy to defeat Mr. Lopez's statute of limitations argument. All of these arguments are unavailing.[1]

## ARGUMENT

I. **Section 1346 Does Not Punish Foreign Commercial Bribery.**

We are not aware of any prior prosecution, either pre- or post-*McNally v. United States*, 483 U.S. 350 (1987), for honest services fraud in which the scheme to defraud involved depriving a foreign non-government employer of the honest services of its foreign employee(s). Given the age of the federal fraud statues, the novelty of the government's theory is all the starker here because the charged scheme to defraud occurred in countries where commercial bribery is not punishable as a crime. Although Congress explicitly prohibited bribery of foreign public officials in the Foreign Corrupt Practices Act ("FCPA"), there is no such express prohibition of foreign commercial bribery, which the FCPA, by its terms, does not punish. *See* 15 U.S.C. §§ 78dd–1, *et seq*. The so-called "domestic" bribery statutes, 18 U.S.C. § 666 and 18 U.S.C. §201, are just that—expressly domestic. The FIFA prosecutions, instead, are based on violations of the soccer organizations' internal codes of ethics, in their various forms, which the government says demand "absolute loyalty" (Gov't. Opp. at 5 (quoting Trial Tr. 291:5–9)) from international soccer officials; deviations from these codes that can be characterized as bribes or kickbacks, the government contends, are punishable as honest services fraud in the United States so long as the scheme at some point involves use of the vast U.S. wire systems. This innovative

---

[1] The government's suggestion (at 1) that Mr. Lopez "do[es] not seriously dispute that [he] participated in an international scheme to make secret payments . . . to soccer officials" is wrong. This post-trial motion merely takes appropriate account of the procedural posture of the case. In that regard, we have not undertaken to correct here all the factual errors in the government's brief, or the ways in which it lumps together defendants who engaged in entirely different conduct; we make note only of errors that are relevant to the motion before the Court. Given the short page limit for this brief, we respectfully ask the Court not to view our decision not to engage with all the government's factual errors as acquiescence in them.

3

approach, which is not moored to any express statutory prohibition, exceeds the bounds of what Congress criminalized in adopting Section 1346 in response to *McNally*—not least because there is no pre-*McNally* precedent for such prosecutions.[2]

The government all but ignores three recent decisions, which post-date this Court's prior decision on this issue, the Second Circuit's decision in *Napout*, and our opening brief. Those decisions apply the Supreme Court's decision in *Skilling* in ways that point to the same principle: § 1346 cannot be flexibly construed to reach novel theories that are not firmly rooted in the pre-*McNally* "core" of honest services precedents. *See Percoco v. United States*, 143 S. Ct. 1130 (2023); *Ciminelli v. United States*, 143 S. Ct. 1121 (2023); *United States v. Abdelaziz*, 68 F.4th 1 (1st Cir. 2023).

In *Abdelaziz*, the First Circuit vacated the convictions of two defendants charged as part of the government's "Varsity Blues" investigation into alleged misconduct related to college admissions. 68 F.4th at 13 (1st Cir. 2023). The defendants argued that payments to the universities—the parties whose interests were purportedly betrayed by their agents—could not constitute bribes under *Skilling*'s interpretation of § 1346. Despite the fact that the alleged bribes at issue were paid directly to accounts controlled by universities—the alleged victim of the scheme—the government argued that the conduct was covered by § 1346. *Id.*

In rejecting the government's theory, the First Circuit highlighted the government's failure to "identif[y] any pre-*McNally* case involving a purported bribe paid to the victim of an alleged bribery scheme," noting that *Skilling* construed § 1346 to cover only the "core of the pre-

---

[2] The government misconstrues this statutory argument when it tries to recast it as an as-applied vagueness challenge. The question is not whether Mr. Lopez had reason to believe commercial bribery was unlawful in the United States; it is about the statutory reach of § 1346 and how constitutional avoidance canons have consistently been applied to narrow that reach.

*McNally* honest services doctrine." *Id.* at 29 (quoting *Skilling,* 561 U.S. at 404) (internal quotation marks omitted). The First Circuit correctly viewed this complete absence of pre-*McNally* caselaw as "constrain[ing] the honest services doctrine's sweep" in the absence of any clear textual intent by Congress to criminalize such conduct. *Id.* at 29. The same is true here. As the district court held in *Giffen*, the government's inability to point to any pre-*McNally* cases involving foreign bribery demonstrates that such a theory is outside the honest services core to which *Skilling* confined § 1346.

The next day, the Supreme Court decided *Percoco* and *Ciminelli*, each unanimously rejecting other "unmoored" applications of the wire fraud statutes by the Second Circuit. *Ciminelli*, 142 S.Ct. at 1128. In *Percoco*, the Court rejected the Second Circuit's theory that a private individual can be said to owe a duty to the public, and thus can be charged with honest services fraud, if he "dominates and controls" any government business, finding that standard too vague. *Percoco*, 143 S. Ct. at 1138. In doing so, the Court emphasized that "*Skilling* was careful to avoid giving § 1346 an indeterminate breadth," and that it must be "defined with the clarity typical of criminal statutes" and must not reach "ill-defined" categories. *Id.* at 1137. As in *Abdelaziz*, the Court emphasized that § 1346 covers only "the 'core' of pre-*McNally* honest services case law and d[oes] not apply to all intangible rights of honest services whatever they might be thought to be." *Id.* at 1136 (internal quotation marks omitted).

Although *Ciminelli* did not deal with § 1346, its analysis was premised on the same principle that the mail and wire fraud statutes do not encompass intangible rights theories except to the limited extent Congress revived certain pre-*McNally* lower court precedents in § 1346. In *Ciminelli*, the Court rejected the Second Circuit's "right-to-control" theory of wire fraud, holding that "potentially valuable economic information" is not a traditionally recognized property

5

interest and therefore cannot be the object of a wire fraud scheme. *See Ciminelli,* 142 S. Ct. at 1127–28. As the Court explained, when Congress enacted § 1346, it sought to revive only *certain* intangible rights that were recognized prior to *McNally*. But a foreign employer's intangible right to a foreign employee's honest services (irrespective of the foreign country's own laws) was not included the "ever-growing swath" of intangible interests pre-*McNally*, *id*. Put simply, Congress could not have intended to revive in § 1346 a category of pre-*McNally* honest services fraud precedents that did not exist prior to *McNally*, particularly given the completely separate treatment of foreign and domestic bribery in then-existing federal criminal statutes.

Taken together, *Abdelaziz*, *Percoco*, and *Ciminelli* make plain the Supreme Court's mandate that without such precedent, and absent any clear textual commitment, Congress did not intend to criminalize commercial bribery worldwide, which would represent a vast expansion of federal criminal intervention into commercial business affairs across the globe. As the Court has often observed, Congress "does not hide elephants in mouse holes." *Whitman v. American Trucking Association*, 531 U.S. 457, 468 (2001). The question presented here is straightforward: can the court presume, in the absence of any express textual indication, and when all existing federal bribery statutes distinguish between foreign and domestic bribery, that in response to *McNally*, Congress intended to restore to federal prosecutors an extraordinarily broad tool to combat foreign commercial bribery that had never been used before and that courts have never recognized (before or since)? The answer is clearly no.

## II. The Government Did Not Prove Required Deception of CONMEBOL.

The government continues to fail to point to any evidence that proves that Lopez understood his conduct in the alleged conspiracy was calculated to deceive or defraud CONMEBOL. The government contends that in order to be found to have had the requisite

6

specific intent to be guilty of honest services fraud, the evidence need only prove that the defendant understood that there was a quid pro quo exchange. *See* Gov. Opp. 26 (citing *United States v. Avenatti*, 432 F. Supp. 3d 354, 365 (S.D.N.Y. 2020)). This argument, however, fails to acknowledge that the specific intent requirement of § 1346 requires proof beyond a reasonable doubt, as reflected in the jury instructions, that the defendant in question understood that the quid pro quo in which he allegedly engaged in "was calculated to deceive." *See* Dkt. 1963 at 40–42; *Abdelaziz,* 68 F.4th at 54–60 (recognizing that a quid pro quo did not necessarily prove fraudulent intent when the defendant could have had a "good faith belie[f] that such a quid pro quo was welcomed by the [organization] and so did not amount to bribery."); *cf. Pfizer, Inc v. United States Dep't of Health & Hum. Servs*., 42 F.4th 67, 74 (2d Cir. 2022) (holding that not all quid pro quo transactions are necessarily corrupt). The government's failure to provide evidence of Mr. Lopez's intent to deceive CONMEBOL, coupled with the overwhelming evidence that every CONMEBOL representative either acquiesced in or knew of the private payments in question, shows that a jury could not reasonably infer that Mr. Lopez had the requisite fraudulent intent without engaging in impermissible speculation.[3] *See* Lopez Br. at 15 (compiling evidence of CONMEBOL's institutional knowledge of the private payments).

The only evidence the government points to regarding Mr. Lopez's state of mind is an article containing a transcript of an interview in which Carlos Martinez (who was acquitted on all

---

[3] The government does not seriously challenge the fact that all CONMEBOL representatives were at least aware of the private payments: it points to Burzaco's testimony where he speculated that Sebastian Bauza "was probably fired for being honest" and to Luis Bedoya's testimony regarding Harold Mayne-Nicholls' refusal to sign Full Play's Copa América contract, but neglects to mention that Bedoya also stated that Mayne-Nicholls' refused to sign due to his concerns about obligations CONMEBOL had pursuant to an existing contract with Traffic, a party that was also making private payments to CONMEBOL. *See* Gov't. Opp. at 29 (citing Trial Tr. 1753:25–1754:3; 4686:2–16).

counts) accurately described the nature of the relationship between Fox and T&T as it pertained to the Copa Libertadores rights, which, importantly, was the main subject of the interview. *See* Gov. Opp. at 29 (citing GX-929-T; GX-2011-T). There is no evidence that Mr. Lopez directed Mr. Martinez to make this statement or that it was made to deceive or even be seen by the allegedly aggrieved parties. The government's purported evidence is tenuous at best, and underscores the government's inability to offer sufficient evidence to support a finding that Mr. Lopez acted with the requisite intent to deceive or defraud CONMEBOL, FIFA, or their constituents.

Faced with this lack of evidence as to Mr. Lopez's specific intent, the government cites evidence that other alleged co-conspirators engaged in secretive or otherwise deceptive acts in an attempt to impermissibly impute those third-parties' fraudulent state of mind to Mr. Lopez. *See* Gov't. Opp. at 28-29. This evidence necessarily fails to satisfy the burden of proving Mr. Lopez's specific intent beyond a reasonable doubt because "[f]or honest services fraud, . . . [a] third party's state of mind is legally irrelevant because the focus of the crime is on the defendant's state of mind[.]" *Avenatti*, 432 F. Supp. 3d at 364.

The First Circuit made clear in *Abdelaziz* that it would amount to impermissible speculation for a jury to impute specific intent to a defendant based on evidence of fraudulent intent of other alleged co-conspirators. *See Abdelaziz,* 68 F.4th at 54–60 (citing *United States v. Martínez*, 994 F.3d 1, 15 (1st Cir. 2021) (vacating conviction where "evidence risked leading the jury in considering her charges to impute the states of mind of [other alleged co-conspirators onto the defendant].")). The court specifically considered evidence that the defendant had a good faith belief that the university—the organization the government alleged was deprived of honest services—had "at least tacitly" approved of the practice of side-door admissions through

athletics, and found lacking the evidence of other alleged co-conspirators' bad faith intent, which the government had argued sufficiently proved that the defendant also acted with the requisite fraudulent intent. *Id*. at 59.

Although the government correctly notes that CONMEBOL itself has a separate legal existence from any one of its officials, the same cannot be said for <u>all</u> of its officials collectively. It is one thing to say that a handful of conspirators can hide something from a larger organization; but the government has not cited any case (and we have found none) suggesting that a jury can infer intent to deceive an organization even when substantially all of the organization's officials were aware of and approved of (or at least acquiesced in) the charged action. *See* Gov't. Opp. at 28–29. Here, given the lack of evidence that any of CONMEBOL's representatives were deceived or defrauded, a jury could not reasonably infer that Mr. Lopez knew or intended that his alleged conduct as a participant in the charged conspiracy was calculated to deceive them. *See United States v. Pauling,* 924 F.3d 649, 662 (2d Cir. 2019) (impermissible "surmise and guesswork" cannot support conviction beyond a reasonable doubt).

## III. The Government Hypothesizes a Conspiracy Different from the Charged Conspiracy and Ignores that Burzaco Worked at Cross-Purposes from Fox.

In response to Mr. Lopez's statute of limitations argument, the government appears to rely on proof that is entirely distinct from the charged conspiracy. The indictment against Mr. Lopez alleges that the goal of the conspiracy was to secure "support of T&T as the holder of the rights to the Copa Libertadores and other soccer events." TSI ¶ 73. To meet its burden, the government strings Burzaco's theft of rights from T&T in 2012 to Fox's subsequent negotiations with CONMEBOL, arguing that by stealing the rights from T&T, "Burzaco ensured even longer success of the conspiracy," that "[h]e told Lopez and Martinez as much, and they agreed to renegotiate the terms of the 2019-2022 contracts among themselves and with CONMEBOL,

9

which they continued to do up until the eve of the government's takedown in May 2015." Gov't. Opp. at 36.

This new factual theory is contradicted by the record. Burzaco testified that he did not tell Mr. Lopez about the theft of rights until Mr. Lopez confronted him in 2013. Trial Tr. 2209:8–23. When asked about a September 2014 meeting attended by Mr. Lopez, Burzaco, and CONMEBOL officials, both Burzaco and Luis Bedoya testified that bribes were not discussed. *Id.* at 2281:24–2282:1, 5059:3–18. When asked about meetings in April 2015 attended by Mr. Lopez, Burzaco, Fox executives, and various soccer officials, Burzaco testified that the negotiations with CONMEBOL were discussed, but there was no mention of bribery. *Id.* at 1366:11–18. The government otherwise ignores the testimony of its own witnesses—Messrs. Pena, Rodriguez and Bedoya—none of whom testified that they had any knowledge of Mr. Lopez's alleged involvement in the scheme *at any time*.[4] The government's evidence does not establish that Burzaco was working to ensure "even longer success of the conspiracy." Gov't. Opp. at 36. To the contrary, it simply demonstrates that by March 18, 2015, T&T had been cut out and that Fox was seeking to deal with CONMEBOL directly.

Burzaco and Fox were also working at odds with one another by March 18, 2015. The government argues that "coconspirators' goals 'need not be congruent for a single conspiracy to exist, so long as their goals are not at cross-purposes,'" Gov't. Opp. at 26 (quoting *United States v. Khalupsky*, 5 F.4th 279, 289 (2d Cir. 2021) (internal citations omitted)), but it completely discounts Burzaco's clear positioning against Fox. In addition to stealing the rights from T&T for his own benefit, Burzaco also testified that his goal for the extension of the 2019–2022 Copa

---

[4] *See* Trial Tr. 3596:25– 3597:7 [Peña]; 3842:1–3843:15 [Rodriguez]; 5055:9–11, 5059:16–18 [Bedoya].

10

Libertadores rights was "to get Fox to pay CONMEBOL" something "very similar" to "as much money as possible." Trial Tr. at 2284:1–2285:10. Taking Burzaco at his word, it is not clear then how Fox could continue paying below-market price for the rights through the charged conduct, as the government alleges. Trial Tr. at 73:3–74:7.

Even accepting the government's evidence of implicit understandings at face value, the government at best proved a reformulated conspiracy that excised T&T in March 2015. Accordingly, the government did not meet its burden of establishing that Mr. Lopez committed the charged offenses[5] within the five-year limitations period.

## CONCLUSION

For the reasons set forth above, and in his opening brief, the Court should enter a judgment of acquittal on all counts against Mr. Lopez. Mr. Lopez also respectfully requests that upon granting this motion, the Court conditionally grant a new trial pursuant to Rule 29(d)(1) for substantially the same reasons as set forth above if the judgment of acquittal is later vacated or reversed.

Dated: June 16, 2023                Respectfully submitted,

                                                                 */s/ David Sarratt*
                                                                  David Sarratt
                                                                  John Gleeson
                                                                  Sarah Wolf
                                                                  Katherine Stein
                                                                  DEBEVOISE & PLIMPTON LLP
                                                                  66 Hudson Boulevard
                                                                  New York, NY 10001
                                                                  (212) 909-6000
                                                                  *Counsel for Hernan Lopez*

---

[5] Relying on *U.S. v. Silver*, 948 F.3d 538, 575-76 (2d Cir. 2020), the government asserts that even if the statute has run on an underlying wire fraud scheme, "a money laundering scheme remains within the statute of limitations so long as any proceeds of the wire fraud scheme are transferred within the applicable period." Gov't. Opp. at 34. But as *Silver* makes equally clear, the Government still must prove "that the defendant *knew* that the proceeds were derived from such unlawful activity." *Silver*, 948 F.3d at 576 (emphasis added).

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of June 2023, the foregoing was served electronically on the counsel of record through the U.S. District Court for the Eastern District of New York Electronic Document Filing System ("ECF") and the document is available on the ECF system.

*/s/ David Sarratt*
David Sarratt
